The UPJOHN COMPANY, Petitioner,

v.

Robert H. FINCH, Secretary of Health, Education & Welfare, and Herbert L. Ley, Jr., Commissioner of Food and Drugs, Respondents.

No. 19926.

United States Court of Appeals, Sixth Circuit.

Feb. 27, 1970.

Order March 3, 1970.

Stanley L. Temko, Washington, D. C., Henry Ford, Jr., Kalamazoo, Mich., Herbert Dym, Washington, D. C., on brief; Ford, Kriekard, Brown & Staton, Kalamazoo, Mich., Covington & Burling, Washington, D. C., of counsel, for petitioner.

William W. Goodrich, Asst. Gen. Counsel, Food and Drug Administration, Washington, D. C., Eugene M. Pfeifer, Attorney, U. S. Department of Health, Education and Welfare, Washington, D. C., of counsel, for respondents.

Daniel Marcus, Wilmer, Cutler & Pickering, Washington, D. C., Bruce J. Brennan, Vice President & General Counsel, Pharmaceutical Manufacturers Assn., Washington, D. C., amici curiae.

Before PHILLIPS, Chief Judge, and EDWARDS and PECK, Circuit Judges.

PHILLIPS, Chief Judge.

This case is before the Court on the petition of the Upjohn Company (Upjohn) to review an order of the Commissioner of Food and Drugs (the Commissioner) under the 1962 Amendments to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 301 et seq. The Commissioner and the Secretary of Health, Education and Welfare (the Secretary) are respondents. The order of the Commissioner was issued September 10, 1969, and was published in the Federal Register, 34 Fed.Reg. 14598, September 19, 1969. A copy of this order is made Appendix A to this opinion. The order denied an evidentiary hearing to Upjohn, repealed certain rules and regulations of the Commissioner and revoked certificates of safety and effectiveness previously issued involving seven fixed combination antibiotic drugs manufactured by Upjohn. The effect of this order of the Food & Drug Administration (FDA) is to forbid future sale and distribution of the drugs in question effective 30 days after publication in the Federal Register.

The petition to review is before this Court by authority of one of the 1962 amendments to the Act, 21 U.S.C.A. § 355(h). The petition was filed October 13, 1969, accompanied by a motion for a stay order pending review. On October 15, 1969, this Court heard oral arguments on the motion to stay. At that hearing the Commissioner through counsel agreed to suspend effectiveness of the order (Appendix A) until this Court has acted on the motion to stay.

On October 30, 1969, this Court on its own motion entered an order advancing the petition for review on the Court's docket and setting it for hearing in the forthcoming December 1969 session, to be considered along with the motion to stay which then was under advisement. This order recognized that the issues in this case are very significant both to the public and to the drug industry. The order provided that in event the Commissioner should see fit to withdraw his voluntary agreement staying effectiveness of his order until further order of this Court, five days advance notice should be given the Court of such contemplated withdrawal. No such notice has been received and the order has not yet been enforced against Upjohn.

Oral arguments on the merits of the petition to review were heard December 8, 1969. The Pharmaceutical Manufacturers Association filed a brief amicus curiae in support of the petition to review.

We affirm.

### 1) *The 1962 Amendments*

An exhaustive investigation of the drug industry was begun on December 7, 1959, by the subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee. Extended hearings were conducted under the leadership of Senator Estes Kefauver of Tennessee, Chairman of the Subcommittee. On April 12, 1961, Senator Kefauver and Senator Philip E. Hart of Michigan introduced S.1552, from which the 1962 Amendments eventually evolved. A summary of the legislative history is attached as Appendix B to this opinion.

In discussing on the Senate floor the conference report on this legislation Senator Kefauver said: "Those in the future who attempt to study the legislative history of this measure as it passed through its various stages may be forgiven if they become somewhat confused." 108 Cong.Rec. 20868 (daily ed. Oct. 3, 1962).[1] We find no confusion, however, as to those parts of this legislation which are before this Court for application in the present case.

In explaining the bill on the floor of the Senate, Senator James O. Eastland, Chairman of the Senate Judiciary Committee, stated that one of the principal features was to require " * * * that

---

I. All references to the Congressional Record in this opinion are to the daily edition.

a new drug be shown to be effective, as well as safe, before it is cleared for the market, and authorize withdrawal of such a drug from the market if new evidence shows it to be ineffective." 108 Cong.Rec. 16303 (Aug. 23, 1962).

Congressman Bennett of Michigan said on the floor of the House:

"The test of effectiveness means * * * to prove that he has 'substantial evidence' to prove that the drug will have the effect it purports to have under the conditions of use prescribed, recommended, or suggested in the labeling. This is a fair requirement * * * New drugs which have already been approved will also be subject to this new test of effectiveness * * *." 108 Cong.Rec. 19,894 (Sept. 27, 1962).

The report of the House Committee states:

"An application will be withdrawn if, on the basis of new evidence, evaluated with that originally submitted, the Secretary finds that the drug is not shown to be safe, or if new information, evaluated together with other evidence, indicates that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have." H.R.Rep.No. 2164, 87th Cong., 2d Sess. 8.

The House Report further states:

"[T]he Secretary could later amend or repeal the regulations on certifications on the ground of lack of efficacy of the drug under such conditions of use, on a finding that there is lack of substantial evidence that the drug has the effect it purports or is represented to have under such conditions of use." Ibid. p. 5.

Although the Senate and House bills differed in other particulars, the language of the bills relating to the effectiveness and safety of drugs was identical with one minor exception. 108 Cong.Rec. 20868. (Oct. 3, 1969).

21 U.S.C. § 355(e) authorizes the Secretary, after due notice and opportunity for hearing, to withdraw approval of an application with respect to any drug if the Secretary finds:

"[O]n the basis of new information before him with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions or use prescribed, recommended, or suggested in the labeling thereof."

Manufacturers of drugs that previously have been subject to the new drug procedure were granted a two-year period of grace before such drugs could be ordered off the market on the sole ground of lack of substantial evidence of effectiveness for uses claimed for them by previously cleared labeling.

The purpose of the 1962 amendments was summarized as follows in Toledo L. Rev. 682 (1969):

"The FDA and the federal government have an important duty to protect the public against the drug menace and to curb the dangers of unsafe and ineffective drugs. The powers of the FDA have been greatly expanded by new regulations and by the 1962 amendments to the Food and Drug Act. Responsible leadership in Congress and the White House has responded to the needs of the public for greater protection against the expanding drug menace * * *."

This Court, speaking through Judge Martin in United States v. Two Bags, etc., 147 F.2d 123, 127 (6th Cir.1945), held that from its inception to its last amendment the purpose of the Pure Food, Drug & Cosmetic Act is "to protect the consuming public" and that the Act should be construed liberally so as to effectuate its purpose. This same rule of construction applies to the 1962 amendments.

2) *Background of Present Proceedings*

The seven drugs manufactured by Upjohn which are involved in this proceed-

ing are marketed under proprietary names as follows:

(1) Albamycin-T Capsules, containing tetracycline hydrochloride and sodium novobiocin.

(2) Panalba Capsules, containing tetracycline phosphate complex and sodium novobiocin.

(3) Panalba Half-Strength Capsules, containing tetracycline phosphate complex and sodium novobiocin.

(4) Albamycin-T Flavored Granules for Suspension, containing tetracycline hydrochloride and calcium novobiocin.

(5) Panalba KM Flavored Granules for Suspension, containing tetracycline and calcium novobiocin.

(6) Panalba KM Drops, Flavored Granules for Suspension, containing tetracycline and calcium novobiocin.

(7) Albamycin G.U. Tablets, containing calcium novobiocin and sulfamethizole.

In 1956 the Commissioner promulgated regulations providing that certain antibiotic drugs containing a combination of tetracycline and novobiocin could be certified as safe and effective. 21 Fed. Reg. 10373. Upjohn's Panalba products were approved and certified by FDA as being both safe and effective in 1956. Marketing of Panalba began in 1957. The other Upjohn products involved in this case thereafter were certified by FDA as safe and effective.

To carry out FDA's responsibilities concerning the efficacy of drugs under the 1962 amendments that agency called upon the National Academy of Sciences —National Research Council (NAS–NRC) to establish a Drug Efficacy Study Group to review the claims of drug manufacturers for all drugs on the market and to make recommendations to FDA with respect to the drugs and drug claims. Information was published in 31 Fed.Reg. 9426, July 9, 1966, giving notice to the antibiotic drug industry pertaining to this agreement with NAS–NRC. Upjohn and other firms were directed to submit a special report which would include "the best data available to support medical claims." Specifically to be included was a "list of literature most pertinent to an evaluation of the effectiveness of the drug[s] for the purposes for which [they were] offered in the label, package insert, or brochure" and any "unpublished articles or other data pertinent to an evaluation of the claims." 31 Fed.Reg. 13014–15, (October 6, 1966.)

After the completion of the studies the NAS–NRC panels reported to the Commissioner that the claims of effectiveness of the drugs in question were unwarranted; that the Upjohn combination drugs Panalba and Albamycin-T (tetracycline and novobiocin) and Albamycin G.U. (novobiocin and sulfamethizole) were ineffective as fixed combinations for all indications specified in the labeling; and that no adequate and well-controlled studies had been found in the scientific literature to support the claims for these drugs.

The Commissioner published a notice of proposed rule making in the Federal Register on December 24, 1968, 33 Fed. Reg. 19203, announcing his intention to amend the antibiotic regulations so as to delete these combination products from the list of drugs acceptable for certification. Upjohn was afforded an opportunity to participate in the proceedings by submitting to the Commissioner any pertinent data bearing on the proposal to repeal the regulations and thus to remove the drugs from the market. Upjohn informed the Commissioner that the 30-day period prescribed by him was inadequate. The Commissioner agreed to a 120-day extension. Various documents and testimonial type letters from physicians were submitted but were ruled to be inadequate as substantial evidence under 21 U.S.C.A. § 355(d). The Commissioner insisted then, as he has throughout this proceeding, that reports of adequate and well-controlled studies are required to support the claims of effectiveness.

During this same period the Commissioner issued another announcement re-

specting the report received from NAS–NRC on albamycin. capsules and syrups, containing novobiocin, in which the Drug Efficiency Study Group recommended deletion of this product from the market or restricting its labeling because it has a limited spectrum of usefulness and high incidence of side effects, including rashes and liver .disorders, together with a rapid and frequent emergence of resistant strains of organisms. FDA concluded that this drug could continue on the market for 'use only as a special purpose second choice anti-staph antibiotic under highly restrictive labeling. 34 Fed.Reg. 7252, (May 2, 1964). It was concluded that this is not a drug of first choice under any circumstance and that it is not indicated as a component of any drug that is recommended for this purpose. Novobiocin is one of the antibiotics in the combination products Albamycin-T, Panalba and Albamycin G.U. It is contained in these products at one-half the usual dose.

On May 9, 1969, the Commissioner signed an order which was published in the Federal Register, 34 Fed.Reg. 7687, (May 15, 1968), amending the antibiotic regulations with respect to these combination products and revoking outstanding certificates which had been issued previously certifying to the safety and effectiveness of these fixed combination drugs. Referring to the frequency of adverse reactions, particularly skin rashes and liver dysfunction, from novobiocin which had been noted by the NAS–NRC panels, and the lack of substantial evidence of effectiveness, the Commissioner found significant medical hazards in the use of Albamycin T, Panalba and Albamycin G.U., without evidence of effectiveness, and concluded that the fixed combination products should be removed from the market. The order by its terms was to become effective 30 days after the date of its publication in the Federal Register, June 16, 1969. The order provided that any person who would be adversely affected could file objections, supported by reasonable grounds, and to request a hearing on

such objections in accordance with 21 U.S.C.A. § 357(f). The order specified that a statement of reasonable grounds for a hearing would have to point out any claimed errors in the NAS–NRC evaluation and identify any adequate and well-controlled investigations on the basis of which it reasonably could be concluded that the combination drugs would have the effectiveness claimed and would be safe for their intended uses. A copy of this order is made Appendix C to this opinion.

Upjohn then filed a suit in the United States District Court for the Western District of Michigan, styled The Upjohn Co. v. Robert H. Finch, Secretary of Health, Education & Welfare, and Herbert L. Ley, Jr., Commissioner of Food & Drugs. In a comprehensive opinion announced July 10, 1969, and reported at 303 F.Supp. 241 (W.D.Mich.), the District Court on principles of equity granted an injunction restraining the Commissioner from enforcing the order of May 15, 1969, until 30 days after the date on which the Commissioner had taken 'appropriate action on the objections filed by Upjohn on June 14, 1969.

The Commissioner then entered an order, 34 Fed.Reg. 12,958, (Aug. 9, 1969), in which he reviewed the Upjohn objections and the medical documentation that had been offered in support of the objections. He concluded that there is no substantial evidence that these fixed combination drugs afford the therapeutic benefits claimed for them, and that the presence of novobiocin makes these fixed 'combinations irrational and hazardous. He found that Upjohn had failed to show reasonable grounds for an evidentiary hearing. An oral hearing was scheduled by the Commissioner and was held on August 13, 1969. A transcript of this oral presentation, consisting of 117 pages, is a part of the record in this proceeding.

Thereupon the Commissioner published his final ruling in the Federal Register, 34 Fed.Reg. 14,598, (Sept. 19, 1969), which is under review in this proceeding (Appendix A hereto). On the same day

the Commissioner published interpretative regulations announcing the essentials of an adequate and well-controlled clinical investigation to constitute substantial evidence within the meaning of the 1962 amendements, 21 U.S.C.A. § 355(d), 34 Fed.Reg. 14,596, (Sept. 19, 1969). These regulations are made Appendix D to this opinion.

### 3) *Issues on Petition for Review*

Upjohn claims irreparable injury if the order goes into effect, pointing out that it has been selling $30 million worth of these drugs each year. It is asserted that the drugs banned by FDA have been on the market for 12 years, can be administered only upon the prescription of a physician, have proved to be commercially successful and millions of doses of them have been prescribed by physicians and sold to patients. Upjohn claims that it has presented to the Commissioner substantial evidence that the combination drugs are both safe and effective under 21 U.S.C. §§ 355(d) and 357(h).

Upjohn protests the provision of the order of the Commissioner refusing to grant an evidentiary hearing on its claims. It complains that it was not afforded sufficient notice or time to prepare and submit evidence of adequate and well-controlled clinical investigations in support of its claims and that the regulations are void under the Administrative Procedure Act, 5 U.S.C. § 553. Upjohn further contends that FDA Commissioner Herbert L. Ley, Jr., in testimony before Congressional committees, exhibited prejudgment and bias and was disqualified to act on the issue of the safety and effectiveness of these fixed combination drugs.

The Secretary and Commissioner respond by relying upon the purposes of the 1962 amendments, which they interpret as requiring FDA to review for effectiveness antibiotic drugs on the market at the time of the enactment of the amendments as well as any new drugs thereafter sought to be sold. The Commissioner contends that under the requirements of these amendments Upjohn must establish by substantial evidence its claims of the effectiveness of the drugs and that the degree of substantial evidence required by the 1962 Amendments, 21 U.S.C. § 355(d) has not been produced; and that Upjohn was not entitled to an evidentiary hearing unless it first came forward with substantial evidence of the safety and effectiveness of the drugs, based upon adequate and well-controlled clinical studies. FDA contends that Upjohn was given sufficient notice and time to prepare and submit evidence of adequate and well-controlled clinical tests in support of its claims. FDA takes sharp issue with Upjohn's contention that Commissioner Ley was disqualified from making a decision on the matters set forth in the FDA order (Appendix A).

### (a) *The issue of substantial evidence*

One of the key provisions of the 1962 amendments is the following definition of substantial evidence, 21 U.S.C.A. § 355(d):

"[T]he term 'substantial evidence' means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or purposed labeling thereof."

Senator Kefauver stated on the floor of the Senate that:

"This section would require, in addition to proof of safety, a showing by substantial evidence, by experts who are experienced in making investigations of the drug involved, that the drug not only will be safe but also will have the effect it purports or is represented to have." 108 Cong.Rec. 16307 (Aug. 23, 1962).

Upjohn asserts that this standard of substantial evidence applies only to new drugs considered by FDA for the first time after enactment of the 1962 amendments, and not to antibiotic drugs once certified by FDA as effective and already on the market. This Court is not willing to adopt such a narrow construction of the Act. We conclude that the legislative history and broad purposes of the Act demonstrate to the contrary. We hold that the interpretative regulations set forth in Appendix D correctly elucidate what Congress itself has plainly written in its definition of substantial evidence and constitute a correct application of the Congressional definition.

■ It is further asserted by Upjohn that FDA could not apply the standard of substantial evidence to remove its products from the market because FDA had no new information or evidence with respect to the drugs in question at the time the certifications were revoked. The record demonstrates to the contrary. At the time he revoked the certifications the Commissioner had before him the unanimous conclusion of thirty experts in antimicrobial therapy that the products in question are ineffective as fixed combinations. A number of other documents in the record, including some of the data submitted by Upjohn, reflect information which became available after these drugs had been certified by FDA and after enactment of the 1962 amendments.

In Bell v. Goddard, 366 F.2d 177, 181 (7th Cir.), a case in which FDA conducted an evidentiary hearing, the Court held that in suspending a drug FDA can consider "clinical experience" occurring both prior and subsequent to the application. The Court said:

"In this case an extensive re-evaluation, which drew together clinical experience in a manner not previously attempted and which perhaps brought its full impact to the attention of the experts for the first time, provided the basis for the Commissioner's findings. An interpretation of the statute prohibiting such a new application of existing information would do violence to the paramount interest in protecting the public from unsafe drugs. The fact that the re-evaluation may have been inspired by a change in administrative policy is irrelevant."

The legislative history of the 1962 amendments recognizes that medical science is not static. The history of medicine is littered with once favored but now discarded remedies. The general fund of knowledge has advanced to a point where experts are equipped to recognize the worthlessness of some drugs and remedies previously considered to be effective.

We conclude from the record that FDA had additional information and evidence in 1969, when the certifications were revoked, which were not available to it in 1956 when Panalba, a fixed combination drug, was first certified as safe and effective.

■ Upjohn further contends that even if the standard of substantial evidence required by the act is applicable in the present case, it has submitted such evidence to FDA in support of its claim. This evidence consists of 54 documents, all but one of which are in the record in this case. These documents, many of which are testimonial in nature, have been examined by the Court. We agree with the Commissioner that these documents do not reflect "adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drugs involved" as required by the statute. 21 U.S.C.A. § 355(d).

■ Finally on the issue of substantial evidence, Upjohn contends that the effectiveness of its combination drugs has been established by their use under prescription of physicians and their wide acceptance by the medical profession over a period beginning in 1957. Upjohn asserts its Panalba products have been prescribed regularly by 23,000

physicians in the United States; that more than 750,000,000 doses of these products have been prescribed since 1957; that 450,000,000 doses of Albamycin-T products and more than 44,000,000 doses of Albamycin G.U. have been prescribed since 1958; that Upjohn is the only pharmaceutical manufacturer in this country that has produced these drugs in these combinations; that sales of these products have averaged more than $30,000,000 per year during the past five years and account for more than twelve per cent of Upjohn's total annual pharmaceutical sales; and that FDA has certified more than 2,400 batches of these products as safe and effective.

It is contended that the public is adequately protected because these drugs can be sold only on the prescription of a physician.

Commissioner Ley has said that:

"The FDA thinks that the physician wants to know which drugs have been found ineffective and which present safety hazards. There are differences among physicians as well as drug companies concerning the NAS reports. The essential question is whether doctors should be informed by a responsible, objective government agency of drug findings by the top medical and scientific experts in the nation. The conclusion is that the FDA does have that responsibility under the law, and that physicians do want to receive that information." 19 Cleveland State L.Rev. 15, 17 (1970).

In his consumer message to the Congress of March 15, 1962, President Kennedy said:

"The physician and consumer should have the assurance * * * that any drug or therapeutic device on the market today is safe and effective for its intended use; * * * and that the accompanying promotional material tells the full story—its bad effects

as well as its good." 108 Cong.Rec. 19,925 (Sept. 27, 1962).

Senator Kefauver stated on the floor of the Senate:

"In my opinion, the bill now before us will assure the people of the United States safer, more effective and better prescription drugs; that physicians will have more accurate information as to drugs; that false and misleading statements as to the efficacy and side effects in advertising and promotional materials will be eliminated, that physicians will receive recent and accurate information about drugs, and that prescribing by generic names will be made simpler and safer." 108 Cong.Rec. 16,306 (Aug. 23, 1962).

The legislative history contains this question by Senator Kefauver and answer by Senator Hart:

"Mr. KEFAUVER. The Senator conducted this important part of the hearings. Is it not true that the drug manufacturers spend $5,000 a year per physician to send out detail men who provide the physician with sample drugs and give him information about their own drugs, and for other selling and promotional expenses?

"Mr. HART. That was indicated from our record of the hearings." 108 Cong.Rec. 16320 (Aug. 23, 1962).

The separate report on S. 1552 submitted by Senator Kefauver and four other members of the Senate Judiciary Committee stated:

"Leading physicians testified that it is impossible to keep currently informed of the state of medical knowledge to be found scattered in hundreds of medical journals on the 400 new drugs introduced each year. Moreover, they stressed that the marketing of a safe but ineffective drug may well be positively injurious to the public health. When an ineffective drug is prescribed, it is usually in place of an older but effective drug. The problem is compounded by the

fact that usually a considerable period elapses between the time when a highly-advertised new drug is put on the market and when knowledge becomes widely disseminated among the medical profession that its performance falls seriously short of its claims." S.Rep. No. 1744, 87th Cong.2d Sess. 37, U.S.Code Cong. & Admin. News 1962, p. 2902.

Also quoted on the House floor was the following excerpt from an article in Fortune Magazine of May 1960:

"Drug companies have learned that doctors respond to the same kind of emotional appeals as laymen. They are influenced by the same advertising techniques that are used by mass consumer advertising. They accept new drugs with amazing rapidity." 108 Cong.Rec. 19926 (Sept. 27, 1962).

Also quoted on the floor of the House was the testimony of Dr. Lena Baumgartner, Commissioner of the New York Department of Health:

"In short, the physician is bombarded with seductive advertising which fails to tell the truth, the whole truth, and nothing but the truth.

"This often misleads him into prescribing a new drug without adequate warning or information about its possible side effects and, indeed, without any solid clinical evidence that the drug is effective or is even as safe as the advertisers claim. It is not sufficient to say that some law in some book presently forbids some of these practices. Long before governmental authorities are in a position to prove the illegality of these practices and get the cumbersome legal machinery into motion and remove the drug from the market, grave harm has been done * * *.

"I can say, however, from personal experience and from the experiences of literally hundreds of doctors with whom we are in close contact that the torrent of new drug advertising which cascades daily into the office of the practicing physician is at once confusing and often misleading.

"The doctor is daily overwhelmed with more material than he can possibly read, to say nothing of remembering the vaguely worded warnings, if, indeed, there is any warning, in small print at the back of an advertising brochure. Even where warning is given in an initial brochure, it is frequently followed by a stream of literature which extols the claimed virtues of the drugs so glowingly as to take all attention away from any hazards in use of the drug." 108 Cong.Rec. 19925 (Sept. 27, 1962).

During the House debate, Congressman Dingell referred to a survey made by the American Medical Association as a service to the Ethical Pharmaceutical Industry concerning the problem of physicians in prescribing advertised drugs. This survey mentioned "exaggerated product claims," "releasing news on a drug to the medical profession before it has been fully tested," and "advertising the advantages of a drug without mentioning the side effects." 108 Cong.Rec. 19924 (Sept. 27, 1962).

Congressman Dingell said:

"During the hearings of our Antitrust Subcommittee on H.R. 6245, a veritable parade of eminent doctors protested the excesses and abuses of drug advertising." 108 Cong.Rec. 19925 (Sept. 27, 1962).

On the floor of the House Congressman Fogarty said:

"Because of the rapidity with which new drugs appear on the market, medical practitioners cannot keep abreast of extensive medical articles on each drug. This information must be easily and readily accessible to them. Neither can the FDA, with its tremendous workload, be expected to establish the side effects of each drug without the cooperation of the drug companies. Therefore, these provi-

sions are essential for preventing possible disasters resulting from unknown side effects, and they would enable the medical profession to more fully and knowledgeably utilize the large and continuously changing drug supply." 108 Cong.Rec. 19909 (Sept. 27, 1962).

The above quotations, together with other parts of the legislative history, demonstrate the Congressional intent that 1962 amendments were enacted for the assistance of practicing physicians as well as for the protection of patients.

Sir Austin Bradford Hill, a distinguished British scientist, once said:

"In medicine, theories and therapeutic practices, including those espoused by the majority come and go. One generation bleeds the ill, another scoffs at bloodletting. One generation insists on prolonged bedrest, another preaches the dangers of immobilization and the benefits of early ambulation for everything from surgery to cardiac infarct. * * * There thus can be no sense of confidence automatically generated by 'traditional' practice; in therapeutics, as in many other areas of human endeavor, there is no magical safety in numbers." S.Rep. 1153, 89th Cong., 2d Sess., 199 (1966).

We hold that the record of commercial success of the drugs in question, and their widespread acceptance by the medical profession, do not, standing alone, meet the standards of substantial evidence prescribed by 21 U.S.C.A. § 355(d).

**(b)** *The issue of an evidentiary hearing*

The most difficult issue presented in this case is whether the Commissioner was required to conduct a full evidentiary hearing before entering his order (Appendix A) removing the drugs in question from the market.

Upjohn insists vigorously upon its right to an evidentiary hearing in which it would have the opportunity to confront and cross-examine the members of the NAS–NRC panels who concluded that its fixed combination products are ineffective. Among the cases relied upon in support of this contention are Greene v. McElroy, 360 U.S. 474, 79 S. Ct. 1400, 3 L.Ed.2d 1377; Morgan v. United States, 304 U.S. 1, 15, 58 S.Ct. 999, 82 L.Ed. 1129; Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 300, 57 S.Ct. 724, 81 L.Ed. 1093, and ICC v. Louisville & Nashville Ry., 227 U.S. 88, 91, 33 S.Ct. 185, 57 L. Ed. 431.

The Commissioner contends that the order here challenged (Appendix A) constitutes rule-making, and that no evidentiary hearing was required under the reasoning of United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081; Conley Electronic Corp. v. F. C. C., 394 F.2d 620 (10th Cir.); Dyestuffs & Chemicals Inc. v. Fleming, 271 F.2d 281 (8th Cir.), cert. denied, 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed. 2d 619; and Sun Oil Co. v. F. P. C., 256 F.2d 233 (5th Cir.).

Upjohn counters by urging that the order here reviewed is not "rule making," but is an adjudicatory order imposing sanctions upon it alone, requiring an evidentiary hearing under Philadelphia Co. v. S. E. C., 84 U.S.App.D.C. 73, 175 F.2d 808, vacated as moot, 337 U.S. 901, 69 S.Ct. 1047, 93 L.Ed. 1715.

In deciding the present case, this Court does not find it necessary to determine whether the order (Appendix A) is rule-making or adjudicatory in character. Regardless of what characterization may be given to this order, we hold that the Commissioner did not commit reversible error upon the record in the present case by revoking the certificates of approval of Upjohn's fixed combination drugs without a full evidentiary hearing.

The legislative history of the Pure Food, Drug & Cosmetics Act demonstrates that an evidentiary hearing is

not required in all cases as a matter of right. 21 U.S.C. § 357(f), which was a part of the Act prior to the 1962 amendments, provides for a public hearing only when "reasonable grounds" are stated therefor. Treating the order as a regulation promulgated by the Commissioner under the rule-making power, Upjohn was not entitled to an evidentiary hearing unless it first established "reasonable grounds" therefor.

As quoted above, 21 U.S.C. § 355 requires substantial evidence of efficacy and safety consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved. Hereinabove we have construed the regulations (Appendix D) as a proper application of the statutory definition of substantial evidence.

■ Whether the order be viewed as rule-making or adjudicatory, we hold that the Commissioner was authorized to demand that a genuine and substantial issue of fact be presented as a prerequisite to an evidentiary hearing—that is, Upjohn be required to demonstrate that it had available and was prepared to present proof of adequate and well-controlled investigations meeting the statutory definition of substantial evidence, in support of its claims for the effectiveness of its drugs. We already have ruled that the 54 documents submitted by Upjohn do not meet this standard of substantial evidence. Upjohn was accorded full opportunity to present substantial evidence, both to the NAS-NRC panels and to FDA, but has failed to do so. We agree with the Commissioner that: "No amount of examination and cross-examination can change the scientific studies and the data reported into something they are not." As said by the Supreme Court in United States v. Storer Broadcasting Co., *supra*, 351 U.S. 192, 205, 76 S.Ct. 763, 772, Congress did not intend that administrative agencies waste their efforts "on applications that do not state a valid basis for a hearing."

**(c)** *The issue of the lack of notice*

■ Upjohn contends that it was not provided with sufficient notice and time to make adequate and well controlled clinical investigations as required by the statutory definition of substantial evidence. It is further contended that the order (Appendix A) and regulation (Appendix D) are invalid because the Commissioner failed to afford notice and an opportunity for comment as required by § 4 of the Administrative Procedure Act, 5 U.S.C. § 553.

The record establishes that Upjohn was afforded an opportunity to provide substantial evidence as early as October 1966. This was by notice published in the Federal Register. 31 Fed.Reg. 13014, October 6, 1966.

On December 24, 1968, notices were published in the Federal Register, 33 Fed.Reg. 19203–04, of the NAS-NRC evaluation that the products were ineffective as fixed combinations. These notices stated the action anticipated by the Commissioner and invited Upjohn to submit pertinent data within 30 days. Thereafter a 120 day extension was granted.

On February 14, 1969, the Commissioner again requested Upjohn to submit any substantial evidence that the Company had.

Prior to making his order final, the Commissioner conducted an oral hearing, at which Upjohn again was given an opportunity to show that it was prepared to present at an evidentiary hearing, if granted, substantial evidence in support of its claims.

We find no lack of notice and no failure on the part of the Commissioner to afford Upjohn a reasonable opportunity to submit substantial evidence in accordance with the statutory definition. We further find that as to the claims of Upjohn the Commissioner has not failed to give notice and an opportunity to comment as required by the Administrative Procedure Act, 5 U.S.C. § 553. To the

extent that this opinion conflicts with Pharmaceutical Manufacturers Assn. v. Finch, 307 F.Supp. 858 (D.Del., January 16, 1970), we respectfully decline to follow that decision. Regardless of whether sufficient notice of the regulation, (Appendix D) was given to other members of the Pharmaceutical Manufacturers Association, the record demonstrates that adequate notice was given to Upjohn. *cf.* N. L. R. B. v. Wyman-Gordon Co., 394 U.S. 759, 765, 89 S.Ct. 1426, 22 L.Ed.2d 709.

**(d)** *The issue of the alleged disqualification of Commissioner Ley*

■ Upjohn contends that Commissioner Herbert L. Ley, Jr. was disqualified to issue the order (Appendix A) because of statements made by him before two Congressional Committees during May 1969. On May 13, 1969, Commissioner Ley testified as a witness at a hearing on drug safety before the Subcommittee on Intergovernmental Regulations of the Committee on Government Relations of the House of Representatives. On May 27 he appeared as a witness before the Monopoly Subcommittee of the Select Committee on Small Business of the Senate. At these hearings he made comments with respect to the fixed combination drugs manufactured by Upjohn and the FDA proceedings and regulations on this subject, including the NAS–NRC evaluations. Upjohn asserts that not only did the testimony of Commissioner Ley disqualify him, but further that questions asked by certain House and Senate members during the hearings were improper intrusions by the legislative branch of government into the administrative process. Upjohn says that it was deprived of an impartial decision because of Congressional intervention into this proceeding before issuance of the final order. A motion for disqualification was filed before the Commissioner August 13, 1969. The Commissioner denied the motion for the reasons stated in his order. (Appendix A).

The testimony of the Commissioner before the Congressional committees occurred after the following events, which have been outlined above but are repeated here for emphasis:

On December 24, 1968, the Commissioner caused to be published in the Federal Register the conclusions of the NAS–NRC evaluation of the seven fixed antibiotic combination drugs here in question. The notices stated that FDA concurred in these conclusions. This decision was reached after a review of data submitted by Upjohn in an effort to establish that the effectiveness of these combination drugs was supported by substantial evidence. On May 9, 1969, prior to his testimony before the Congressional Committees, Commissioner Ley had signed an order giving notice of his proposal to amend the regulations for certification of antibiotic drugs and to delete the seven combination drugs manufactured by Upjohn. This order was published in the Federal Register, 34 Fed.Reg. 7687 (Appendix C).

Upjohn relies upon American Cyanamid v. Federal Trade Commission, 363 F.2d 757 (6th Cir.), and Texaco v. Federal Trade Commission, 118 U.S.App.D.C. 366, 336 F.2d 754. We conclude that those decisions involved different factual situations and are not applicable here. The testimony of the Commissioner before the Congressional Committees concerning orders previously signed by him did not constitute pre-judgment of the controversy and did not disqualify him from entering the final order (Appendix A). Our examination of his testimony before the two Congressional committees convinces us that the Commissioner was not disqualified and that Upjohn was not deprived of an impartial decision by the hearings before the two Congressional committees or by an intrusion of the committees into the administrative process before entry of the final order.

All other contentions made in support of the petition to review have been considered and found to be without merit.

Affirmed.

## APPENDIX A

Order published in 34 Fed.Reg. 14598 (Sept. 19, 1969).

PART 141c—CHLORTETRACYCLINE (OR TETRACYCLINE) and CHLOR- TETRACYCLINE- (OR TETRACY- CLINE-) CONTAINING DRUGS: TESTS AND METHODS OF ASSAY

PART 146c—CERTIFICATION OF CHLORTETRACYCLINE (OR TET- RACYCLINE) AND CHLORTETRA- CYCLINE- (OR TETRACYCLINE-) CONTAINING DRUGS

### PART 148j—NOVOBIOCIN

Novobiocin-Tetracycline Combination Drugs: Calcium Novobiocin-Sulfa- methizole Tablets; Final Order Re- pealing Regulations and Revoking Certificates

On Saturday, August 9, 1969, there was published in the Federal Register, 34 F.R. 12958, an order ruling on the Upjohn Co.'s objections and request for a hearing. Upjohn was afforded an op- portunity to make an oral presentation before the Commissioner to offer its analysis of the reported medical litera- ture on which it relies and explain its theory as to why the medical documenta- tion it included in its objections can and should be accepted as satisfying the le- gal requirements of "substantial evi- dence" to support its claims of effective- ness for the fixed combination antibiotic drugs, tetracycline-novobiocin and sulfa- methiozole-novobiocin, marketed by Up- john under the trade names Panalba, Al- bamycin-T and Albamycin G.U.

On Wednesday, August 13, the oral presentation was made.

1. *Upjohn's motion to disqualify the Commissioner.* At the outset, Upjohn filed a motion and brief to disqualify the Commissioner on the grounds that he had prejudged the facts and that there had been an improper intrusion into the administrative process by the Monopoly Subcommittee of the Senate Select Committee on Small Business and by the Subcommittee on Intergovern- mental Relations, House Committee on Government Operations, in Hearings on May 13 and May 27.

Both subcommittees were examining the Food and Drug Administration's ac- tions to implement the reports of the National Academy of Sciences-National Research Council and the requirements of proof of effectiveness on fixed combi- nation antibiotic drugs.

These subcommittees sought informa- tion as to what administrative steps had been taken and the basis for the actions. Answering these inquiries did not pre- judge the facts involved. Nor did the congressional hearings improperly in- trude into the administrative process. The Commissioner stated that he had acted on scientific data that was before him on May 9, but made it clear that Upjohn would have an opportunity to object, to request a public hearing, and to show reasonable grounds for a hear- ing. When the objections were filed on June 16, 1969, an additional review of the medical documentation was under- taken. And the critical issue now is whether the medical documentation sat- isfies the legal requirements. Over a period of months, the Commissioner has given Upjohn several opportunities to support its claims, and has maintained a willingness to examine all of the data the company has been able to present. Evaluating the data to take the steps re- quired by law, such as the notice of pro- posed rule-making on December 24, 1968, the repeal of the regulations on May 9, 1969, and the publication of an order ruling on the Upjohn's objections on August 9, were not improper pre- judgments of the scientific facts. The motion is denied.

2. *Upjohn's medical documentation does not satisfy the requirement of sub- stantial evidence.* Upjohn's most ear- nest plea at the oral presentation was that it had shown reasonable grounds for a hearing and that a hearing on its objections was required. Its counsel listed eight factual issues it had present- ed in its initial objections and 10 ques- tions it thought raised by the August 9 order.

These questions do not confront the vital issue whether, accepting the medical documentation offered by the Upjohn Co. as authentic, this documentation meets the statutory criteria of adequate and well-controlled investigations, including clinical investigations, on the basis of which it can fairly and responsibly be concluded by appropriately qualified experts that the fixed combination drugs will have the effectiveness they purport to possess and that they are represented to possess.

No amount of examination and cross-examination and oral explanation can change the scientific studies and the data reported into something they are not.

The real point at issue is what kind of scientific data is required by law to support the claims of effectiveness for the fixed combination antibiotic drugs.

Upjohn contends that "the totality of materials, which include these 54 articles, the material submitted to the FDA over the years since these products were certified, and the clinical experience in totality clearly satisfy the substantial evidence." It says that "clinical experience, widespread throughout the world, used by thousands upon thousands of doctors in 750 million doses * * * is a very significant factor."

The Commissioner concludes that Congress itself has described the type of evidence that is suitable to support claims of effectiveness. The claims must be supported by adequate and well-controlled investigations. This means that the experimental factors must be so controlled that the effectiveness of an anti-infective drug on the disease process in patients can be compared with the effect of no treatment or of a recognized effective treatment of patients with the same disease conditions. The Commissioner concludes that with combination drugs purported to have advantages exceeding those of the components, there must be adequate, well-controlled data documenting the claimed advantages.

While a controlled investigation does not always require comparisons with placebo or with a known active drug, when that type of double blind clinical study is not done other factors must be controlled for the study to yield meaningful results.

In this case, only three partially controlled studies have been identified. Two involve Panalba and the other Albamycin-T. They do not purport to cover the full range of claimed effectiveness for the combination drugs. Each of the three studies has a number of deficiencies that have been noted in the August 9 order. These three studies do not qualify as adequate and well-controlled investigations on the basis of which it could fairly and responsibly be concluded by experts that the drugs will have the effectiveness they purport to possess and that they are represented to possess.

Upjohn recognizes this fact, but contends that the several in vitro studies reported, the mouse study, and the uncontrolled observations reported in the literature, when added to the evidence obtained from the studies in which controls were attempted, raise the quality of the data to the level required by the law.

The in vitro studies are suggestive of some effectiveness for the combination of antibiotics in laboratory experiments utilizing artificially cultivated micro-organisms as test systems, but because the studies are not at all correlated with clinical experience they cannot be used as a basis for concluding that the drugs will have the effectiveness claimed for them when used to treat naturally occurring clinical disease in man.

The single mouse study adds little. The authors admit that these experimental results with infections induced experimentally cannot be extrapolated to clinical experience.

The uncontrolled studies, made without comparison groups of patients and without other features of control that would yield comparative results such as

by comparison with established treatments, yield only a type of qualitative comparison without any documentation or measured parameters. A large number of uncontrolled observations cannot have equal weight with adequate and well-controlled investigations. These are random clinical observations without true scientific significance. Upjohn's medical spokesman agreed that quantitative evaluations should be done, and that there has been a trend toward such studies over the last 10 or 15 years, yet such studies are not available for appraising the effectiveness of the fixed combination drugs at this time.

Upjohn contends that bacteriologic tests in these studies constitute controls in a clinical study.

Bacteriological tests, especially if they include sensitivities as well as cultures, contribute to the control of studies by permitting control of one variable, that of etiology. This permits exclusion from the final results of those infectious cases in which the organism was resistant to the test drug and in which any patient improvement could not reasonably be attributed to the drug.

For adequate control, the treated group must be compared to an appropriate control group who are either untreated (placebo) or treated with some accepted form of therapy. Under some circumstances, the control group might be derived from the well-documented natural history of the disease, providing the conditions of observation of that group permit comparison with the treated group.

If an in vitro study shows a combination of antibiotics to have a "clear advantage over the use of a single antibiotic", as Dr. Vecchio stated, this can be tested in a controlled clinical situation in a number of ways, none of which has been done for these combinations. One way is to set up a double blind study and use control groups of patients, randomly selected, each group receiving one of the antibiotics alone, and one group receiving the fixed combination drug, and compare the clinical results.

Another way is to study a single disease, the natural course of which is known, including response to each of the component drugs alone, use only the combination drug being tested, and perform bacteriologic studies to be sure that any improvement which results can be attributed to the combination drug. The results must be compared with those obtained with each component alone.

Without the controls outlined, clinical studies are virtually meaningless.

3. *The reclassification of one study as inadequately controlled rather than uncontrolled.* There was some question as to whether the Seddon Study should be classified as a controlled study.

This paper was classified as an uncontrolled study in the August 9 order.

At the oral presentation, I stated that the paper should have been classified with the studies in which control was attempted.

This study was placed originally in the "uncontrolled" group because the method for randomization of the patients' assignment into the two groups, Albamycin-T and Tetracycline, was vague or undetermined, and therefore the validity of the significance level of the claimed results could not be assessed.

For example, the study was designed to include both those patients with acute and those with chronic bronchitis, but it does not explain how many of each were assigned to each treatment group. Table II reports on 63 patients in the tetracycline group and 60 in the Albamycin-T group. But, these two groups of patients total 123, not 143, the number of patients in the study. In addition, Table II indicates that three (3) out of the 63 patients in the tetracycline group had had no previous attacks of bronchitis, and nine (9) out of the 60 patients in the Albamycin-T group had had no previous attacks. Using these figures in Table II, it can be seen that three out of 63, or 4.7 percent of the tetracycline group had acute, first-time bronchitis, whereas nine out of 60, or 15

percent of the Albamycin-T group had acute, first-time bronchitis. It is reasonable to expect that first-time bronchitis responds more readily to treatment than chronic bronchial infection. This bias, in my opinion, makes the study as a whole uncontrolled even though a control group was technically present.

4. *Upjohn's insistence upon an evidentiary hearing.* The issues presented by Upjohn's counsel as disputed issues of fact (Argument, pp. 17–20) are not issues which require an evidentiary hearing.

In the "Dyestuffs" case, the Supreme Court had ruled that the statute did not require or allow the establishment of a safe tolerance for a coal tar color that was itself toxic. When the company objected to an order removing certain colors from the approved list, instead of establishing a safe tolerance for them, the court of appeals held that the objections presented on grounds for a hearing because the agency was being asked to take action it was not lawfully authorized to take.

Here the Congress has defined the kind of evidence that must be presented by sponsors of new drugs and antibiotic drugs to support the claims of effectiveness. Upjohn is asking for a hearing to prove that it has other kinds of evidence, particularly successful marketing experience with the combination drugs and a number of uncontrolled, partly controlled, and in vitro studies, which, it contends, can satisfy the requirement of "substantial evidence." The Agency cannot accept this evidence as a substitute for what the law plainly requires, and a hearing to prove Upjohn's marketing experience or the opinions of a number of experts that they would accept the evidence available as substantial evidence of effectiveness would not change the situation.

Upjohn's claim that it has had no opportunity to develop or to present the kind of evidence newly required as a result of the December 1968 announcement

fails to take account of the fact that this substantial evidence requirement was introduced in 1962. The NAS–NRC classification of Panalba as ineffective as a fixed combination was simply a way of stating that there is no substantial evidence that the drug will have the effectiveness it purports and is represented to possess. Eight months have passed since that evaluation was announced. The time has come to end the marketing of these combination drugs which fail to meet the legal standards of effectiveness and which involve a significant and unacceptable hazard in the light of the failure of proof of effectiveness.

Therefore, pursuant to the provisions of the Federal Food, Drug, and Cosmetic Act (Secs. 502, 507, 52 Stat. 1050–1051, as amended, 59 Stat. 463, as amended; 76 Stat. 780, 781, 785–787; 21 U.S.C. §§ 352, 357), and under authority delegated to the Commissioner (21 CFR 2.120), the request for an evidentiary hearing is denied, Parts 141c, 146c, and 148j are amended by repealing §§ 141c.234, 141c.238, 141c.239, 141c.261, 146c.234, 146c.238, 146c.239, 146c.261, and 148j.4, and certificates of safety and effectiveness issued under those regulations are revoked.

*Effective date.* In accordance with the order dated July 25, 1969, in The Upjohn Company v. Finch, et al., C.A. No.163, U.S. District Court for the Western District of Michigan, this order shall become effective 30 days after publication in the Federal Register.

Dated: September 10, 1969.
> HERBERT L. LEY, Jr.,
> *Commissioner of Food and Drugs.*

### APPENDIX B

Summary of Legislative History of 1962 Amendments

On March 14, 1962, while the Kefauver-Hart bill was pending before the Senate Judiciary Committee, President Kennedy sent a special consumer message to the Congress calling attention to the need for new legislative authority to advance and protect the interests of con-

sumers in the marketing of drugs. On April 10, 1962, President Kennedy wrote a letter to Chairman James O. Eastland of the Senate Judiciary Committee, urging that the bill be strengthened and emphasizing the need for certain specific amendments. The bill was reported by the Committee to the Senate on July 19, 1962. Thereafter, as a result of the disclosure of widespread birth defects in babies associated with the use of thalidamide by pregnant women, the Senate Committee made another review of the subject and on August 20 recommended a number of amendments to the bill as previously reported.

One of the recommendations of the President was that the Department of Health, Education and Welfare should be empowered to withdraw approval of a drug on the basis of substantial doubt of its efficacy or safety.

The bill as reported by the Senate Judiciary Committee included amendments which generally were in line with the recommendations of the President. Senate Report No. 1744, 87th Cong. 2d Sess. With two floor amendments the Senate approved the bill without a dissenting vote on August 23, 1962.

Meanwhile a somewhat different drug bill had been introduced in the House by Congressman Oren Harris, Chairman of the Committee on Interstate & Foreign Commerce, H.R. 11581. The House used this bill as its vehicle in its consideration of this legislation. The House Committee recommended an amendment which struck all of the bill after the enacting clause and substituted a new bill. House Report No. 2164, 87th Cong. 2d Sess. With certain floor amendments the House approved the bill September 27, 1962. Congressman Harris led the debate for the bill on the floor of the House.

A conference committee submitted a revised bill, Report No. 2526, 87th Cong. 2d Sess., which was approved by both the House and Senate and signed by the President. The 1962 amendments became law October 10, 1962.

## APPENDIX C

Regulation published in 34 Fed.Reg. 7689, May 15, 1969

### Title 21—FOOD AND DRUGS

Chapter I—Food and Drug Administration, Department of Health, Education, and Welfare

### SUBCHAPTER C—DRUGS

PART 141c—CHLORTETRACYCLINE (OR TETRACYCLINE) AND CHLORTETRACYCLINE- (OR TETRACYCLINE-) CONTAINING DRUGS; TESTS AND METHODS OF ASSAY

PART 146c—CERTIFICATION OF CHLORTETRACYCLINE (OR TETRACYCLINE) AND CHLORTETRACYCLINE- (OR TETRACYCLINE-) CONTAINING DRUGS

### PART 148j—NOVOBIOCIN

Novobiocin-Tetracycline Combination Drugs; Calcium Novobiocin-Sulfamethizole Tablets

In the Federal Register of December 24, 1968 (33 F.R.19203–04), the Commissioner of Food and Drugs announced the conclusions of the Food and Drug Administration following evaluation of reports received from the National Academy of Sciences—National Research Council, Drug Efficacy Study Group, on the following preparations marketed by The Upjohn Co., Kalamazoo, Mich. 49001:

1. Albamycin-T capsules containing tetracycline hydrochloride and sodium novobiocin.

2. Panalba capsules containing tetracycline phosphate complex and sodium novobiocin.

3. Panalba, half-strength capsules containing tetracycline phosphate complex and sodium novobiocin.

4. Albamycin-T flavored granules for suspension containing tetracycline hydrochloride and calcium novobiocin.

5. Panalba KM flavored granules for suspension containing tetracycline and calcium novobiocin.

6. Panalba KM drops, flavored granules for suspension containing tetracycline and calcium novobiocin.

7. Albamycin G.U. tablets containing calcium novobiocin and sulfamethizole.

The announcements stated that the Academy report found these products ineffective as a fixed combination for the indications specified in their labeling and that the Food and Drug Administration concurred that there is a lack of substantial evidence that each ingredient of the above combinations contributes to the claimed clinical effect. The panel noted the great frequency of adverse reactions (particularly skin rashes and hepatic dysfunction) from novobiocin. All interested persons were invited to submit within 30 days any pertinent data bearing on the proposal to amend the antibiotic drug regulations where necessary to delete the above antibiotic combinations from the list of drugs acceptable for certification.

Representatives of The Upjohn Co. promptly informed the Commissioner that the 30-day period was inadequate to enable them to supply additional information on the question of the efficacy of these drugs, and, acting on the representations made, the Commissioner agreed informally that the 30-day period for submission of new data could be extended for an additional period. The Commissioner received many testimonial type letters but no results of adequate and well-controlled studies which support the claimed clinical effectiveness of the drugs.

Accordingly, the Commissioner notified the manufacturer that reports of adequate and well-controlled studies would be required and that testimonial support for the claims was not acceptable. The response was that the company has no new data from controlled studies of the efficacy of these drugs and that it could not accumulate such data without the preparation of an elaborate and costly protocol for a clinical study that would require about 2 years for completion. The Commissioner, therefore, finds that substantial evidence of effec-tiveness required by law has not been presented.

On April 25, 1969, the Commissioner issued notice of the report received from the National Academy of Sciences—National Research Council, Drug Efficacy Study Group, on Albamycin capsules and syrups containing novobiocin. This report, in which the FDA concurred, would require markedly restricted indications for use for novobiocin in light of its limited spectrum of usefulness, its high incidence of side effects, and the rapid emergence of resistant organisms.

The Commissioner concludes from these reports that there are significant medical hazards, without evidence of ef- and Panalba; that novobiocin is not the drug of first choice in any infection and is not indicated in any combination product; that Panalba and Albamycin-T should be withdrawn from the market; and that Albamycin Syrup and Capsules should be promptly relabeled with the new indications.

Accordingly, the Commissioner concludes that the regulations for the certification of antibiotic drugs should be amended as follows to delete the above-listed antibiotic combinations from the list of drugs acceptable for certification because of a lack of substantial evidence that the drugs will have the effectiveness they purport and are represented to have, and more particularly, that each ingredient in the above combinations contributes to the claimed clinical effect of the drugs. The Commissioner further concludes that the certificates of safety and effectiveness heretofore issued for the combination drug should be revoked on the basis of the unwarranted hazard.

Therefore, pursuant to the provisions of the Federal Food, Drug, and Cosmetic Act (secs. 502, 507, 52 Stat. 1050–1051, as amended, 59 Stat. 463, as amended; 21 U.S.C. §§ 352, 357) and under authority delegated to the Commissioner (21 CFR 2.120), Parts 141c, 146c, and 148j are amended by repealing §§ 141c.-234, 141c.238, 141c.239, 141c.261, 146c.-

234, 146c.238, 146c.239, 146c.261, and 148j.4 and certificates of safety and effectiveness issued under those regulations are revoked.

The Upjohn Co., having been informed of the Commissioner's intention, has requested that the matter be the subject of a public hearing. Any person who will be adversely affected by the removal of any such drugs from the market may file, within 30 days of publication hereof in the Federal Register, objections to this order stating reasonable grounds and requesting a hearing on such objections. A statement of reasonable grounds for a hearing must identify the claimed errors in the NAS–NRC evaluation and identify any adequate and well-controlled investigations on the basis of which it could reasonably be concluded that the combination drug would have the effectiveness claimed and would be safe for their intended uses.

*Effective date.* This order shall become effective 30 days after the date of its publication in the Federal Register to allow time for a recall to be completed. Certification of new stocks has been discontinued.

(Secs. 502, 507, 52 Stat. 1050–1051, as amended, 59 Stat. 463, as amended; 21 U.S.C. § 352, 357)

Dated: May 9, 1969.
HERBERT L. LEY, Jr.,
*Commissioner of Food and Drugs.*
[F.R.Doc. 69–5780; Filed, May 14, 1969; 8:47 a. m.]

APPENDIX D

Regulation published in 34 Fed.Reg. 14598 (Sept. 19, 1969).

SUBCHAPTER C—DRUGS
PART 130—NEW DRUGS

PART 146—ANTIBIOTIC DRUGS: PROCEDURAL AND INTERPRETATIVE REGULATIONS

Hearing Procedure for Refusal or Withdrawal of Approval of New Drug Applications and for Issuance, Amendment, or Repeal of Antibiotic Drug Regulations; Interpretative Description of Adequate and Well-Controlled Clinical Investigations

The reports of the drug effectiveness review conducted by the National Academy of Sciences — National Research Council, Drug Efficacy Study Group, have resulted and will continue to result in the initiation of formal administrative proceedings to withdraw approval of new drug applications and to repeal regulations which provide for the certification of batches of antibiotic drugs. Before initiating such proceedings, the NAS–NRC reports are published and mailed to interested persons to offer an opportunity to present any available evidence that would satisfy the requirements of law as defined by the term "substantial evidence." If no such evidence is presented, formal proceedings are initiated on the ground there is a lack of substantial evidence to support the effectiveness the drugs purport and are represented to possess.

After the issuance of a notice of opportunity for a hearing on the proposed withdrawal of new drug approval, and after the publication of an order repealing an antibiotic regulation, persons who will be adversely affected are entitled to request a hearing. Before any evidentiary hearing will be ordered, it must appear affirmatively that there is a genuine and substantial issue of fact requiring such a hearing. In the case of novobiocin-tetracycline and novobiocin-sulfamethizole fixed combination drugs, which are the subject of another publication in this issue of the Federal Register, the Commissioner has ruled that the medical documentation offered by the Upjohn Co. in support of its request for a hearing does not provide any adequate and well-controlled clinical investigational data to support the promotional claims, that the agency cannot accept the type of empirical evidence of effectiveness the company seeks to offer through an evidentiary hearing as satisfying the requirement of law for "substantial evidence", and thus that there is no genu-

ine and substantial issue of fact requiring an evidentiary hearing.

The scientific principles which characterize an adequate and well-controlled clinical investigation, and the reasons why the data presented in support of the drug claims do not satisfy these principles, are set forth in that order and are published here for application in all similar administrative proceedings, whether in connection with the withdrawal of new drug approval or the repeal of antibiotic regulations. Unless a new drug applicant seeking a hearing on the proposed withdrawal of his application or the sponsor of an antibiotic drug covered by a regulation that is being repealed can show a reasonable likelihood that he is prepared to produce "substantial evidence" derived from adequate and well-controlled clinical investigations in support of his promotional claims, there is no basis for a hearing to receive evidence that would not in any event satisfy the legal requirement as to proof of effectiveness.

Therefore, pursuant to the provisions of the Federal Food, Drug, and Cosmetic Act (secs. 505, 507, 701(a), 52 Stat. 1052, 1055; 59 Stat. 463; as amended by Public Law 87–781, 76 Stat. 781–782, 785–787, 21 U.S.C. §§ 355, 357, 371(a)) and under authority delegated to the Commissioner (21 CFR 2.120), Parts 130 and 146 are amended as follows:

1. Section 130.12(a) (5) is revised to read as follows:

§ 130.12 *Refusal to approve the application.*

(a) * * *

(5) (i) Evaluated on the basis of information submitted as part of the application and any other information before the Food and Drug Administration with respect to such drug, there is lack of substantial evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experienced to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling.

(ii) The following principles have been developed over a period of years and are recognized by the scientific community as the essentials of adequate and well-controlled clinical investigations. They provide the basis for the determination whether there is "substantial evidence" to support the claims of effectiveness for "new drugs" and antibiotic drugs.

(a) The plan or protocol for the study must include the following:

(1) A clear statement of the objective of the study.

(2) A method of selection of the subjects that provides for:

(i) Adequate confirmation of the disease state present, including criteria of diagnosis and appropriate confirmatory laboratory tests.

(ii) Assignment of the patients to test groups without bias.

(3) An outline of the methods of quantitation and observation of the parameters studied in the subjects.

(4) A description of the steps taken to document comparability of variables, such as age, sex, duration of disease and use of drugs other than those being studied.

(5) A description of the methods of recording and analyzing the patient response variables studied and the means of excluding or minimizing bias from the observations.

(6) A precise statement of the nature of the control group against which the effects of the new treatment modality can be compared. Three types of controlled comparisons are possible;

(i) Placebo control: The new drug entity may be compared quantitatively with an inactive placebo control. This type of study requires at the minimum that the patient not be able to distinguish between the active product and

the placebo. Double blinding, to include the clinical observer, may or may not be desirable, depending on the measurement system used to evaluate the results.

(*ii*) Active drug control: The new drug entity may be compared quantitatively with another drug known to be effective in situations where it is not ethical to deprive the subject of therapy. The same considerations to the level of "blinding" apply as with a placebo control study.

(*iii*) Historical control: In some circumstances, involving diseases with high and predictable mortality (acute leukemia of childhood) or with signs and symptoms of predictable duration or severity (fever in certain infections), the results of use of a new drug entity may be compared quantitatively with prior experience historically derived from the adequately documented natural history of the disease in comparable patients with no treatment or with treatment with an established effective therapeutic regimen.

(*7*) A summary of statistical methods used in analysis of the data derived from the subjects.

(*b*) For such an investigation to be considered adequate for consideration for approval of a new drug, it is required that the test drug be standardized as to identity, strength, quality, purity, and dosage form to give significance to the results of the investigation.

(*iii*) Uncontrolled studies or partially controlled studies are not acceptable evidence to support claims of effectiveness. A study is uncontrolled when there is no comparison study against which to evaluate the treatment results, or when such experimental factors as disease identity are not controlled.

(iv) A study is inadequately controlled when the criteria for patient selection are not adequately defined, investigator bias is not minimized, or an inadequately sensitive method of observation and evaluation of results is employed.

\*　\*　\*　\*　\*　\*

2. Section 130.14(b) is revised to read as follows:

§ 130.14　*Contents of notice of hearing.*

\*　\*　\*　\*　\*　\*

(b) If the applicant elects to avail himself of the opportunity for a hearing, he is required to file a written appearance requesting the hearing within 30 days after the publication of the notice and giving the reason why the application should not be refused or should not be withdrawn together with a well-organized and full factual analysis of the clinical and other investigational data he is prepared to prove in support of his opposition to the notice of opportunity for a hearing. A request for a hearing may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine and substantial issue of fact that requires a hearing. When it clearly appears from the data in the application and from the reasons and factual analysis in the request for the hearing that there is no genuine and substantial issue of fact which precludes the refusal to approve the application or the withdrawal of approval of the application, e. g., no adequate and well-controlled clinical investigations to support the claims of effectiveness have been identified, the Commissioner will enter an order on this data, making findings and conclusions on such data. If a hearing is requested and is justified by the applicant's response to the notice of hearing, the issues will be defined, a hearing examiner will be named, and he shall issue a written notice of the time and place at which the hearing will commence, not more than 90 days after the expiration of such 30 days unless the hearing examiner and the applicant otherwise agree.

\*　\*　\*　\*　\*　\*

3. The heading of Part 146 is changed to read as set forth above.

4. Section 146.1 (34 F.R. 6238) is amended by revising paragraph (d) and

by adding a new paragraph (g), as follows:

§ 146.1 *Procedure for the issuance, amendment, or repeal of regulations.*

\* \* \* \* \* \*

(d) The Commissioner on his own initiative or on the application or request of any interested person may publish in the Federal Register a notice of proposed rule-making to issue, amend, or repeal any regulation contemplated by section 507 of the act. An opportunity shall be given for interested persons to submit written comments and to request an informal conference on the proposal, unless such notice and opportunity for comment and informal conference have already been provided in connection with the announcement of the reports of the National Academy of Sciences—National Research Council, Drug Efficacy Study Group, to persons who will be adversely affected, or unless the no controversy or imminent hazard conditions set forth in paragraph (b) of this section have been met. After considering the written comments, the results of any conference, and the data available, the Commissioner will publish an order acting on the proposal, with opportunity for any person who will be adversely affected to file objections, to request a hearing, and to show reasonable grounds for the hearing. The statement of reasonable grounds and request for a hearing shall be made in writing within 30 days after the publication of the order acting on the proposal, and shall state the reasons why the proposal should not be adopted, or should not be adopted as proposed, together with a well-organized and full factual analysis of the clinical and other investigational data the objector is prepared to prove in support of his objections. A request for a hearing may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine and substantial issue of fact that requires a hearing. When it clearly appears from the data incorporated into or referred to by the objections and from the factual analysis in the request for a hearing that there is no genuine issue of fact which precludes the action taken on the proposal, e. g., no adequate and well-controlled clinical investigations to support the claims of effectiveness have been identified, the Commissioner will enter an order on this data, making findings and conclusions on such data. If a hearing is requested and justified by the objections, the issues will be defined and a hearing examiner named to conduct the hearing, in which case the provisions of Subpart F of Part 2 of the chapter shall apply to such hearing, except as modified by paragraph (f) of this section, and to judicial review in accord with section 701(f) and (g) of the act.

\* \* \* \* \* \*

(g) (1) No regulation providing for the certification of any batch of any drug composed wholly or in part of any kind of penicillin, streptomycin, chlortetracycline, chloramphenicol, bacitracin, or any other antibiotic drug, or any derivative thereof, intended for use by man shall be pomulgated and no existing regulation will be continued in effect unless it is established by "substantial evidence" that the drug will have such characteristics of identity, strength, quality, and purity necessary to adequately insure safety and efficacy of use. "Substantial evidence" has been defined by Congress to mean "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effectiveness it purports and is represented to have under the conditions prescribed, recommended, or suggested in the labeling thereof." This definition is made applicable to a number of antibiotic drugs by section 507(h) of the act, and it is the test of efficacy that will be applied in promulgating, amending, or repealing regulations for the certification of all antibiotics under section 507(a) of the act as well.

(2) The scientific essentials of an adequate and well-controlled clinical investigation and some characteristics of uncontrolled and inadequately controlled clinical investigations are described in § 130.12(a) (5) of this chapter.

*Effective date.* This order which is procedural and interpretative shall be effective upon publication in the Federal Register.

Dated: September 10, 1969.

Herbert L. Ley, Jr.,
*Commissioner of Food and Drugs.*

## ORDER

The issues in this action arise from an order issued by the respondent Commissioner of Food and Drugs published in the Federal Register (34 Fed.Reg. 14598) on September 19, 1969. The petition to review that order was filed October 13, 1969, and oral arguments on an accompanying motion for a stay order were heard on October 15, 1969. On that date counsel for the respondents made an oral commitment in open court stipulating that the Department would not act to enforce the September 19, 1969, administrative order revoking the certification regulations applicable to tetracycline-novobiocin fixed combination drugs prior to a ruling by this Court on petitioner's (hereinafter "Upjohn") motion for a stay. On October 30, 1969, we sua sponte advanced the action for hearing and provided that the voluntary agreement staying effectiveness of the September 19, 1969, order could only be withdrawn after the giving of five-days notice of such contemplated withdrawal.

Subsequent to submission after hearing oral arguments on the merits, we affirmed the order under review. Such affirmance was announced by opinion dated February 27, 1970, which announcement date was dictated by the completion of the printing of the opinion. Two days prior to that announcement counsel for the respondents advised the Court by letter to the clerk of their withdrawal of the oral commitment to continue the certification of tetracycline-novobiocin combination drugs as safe and effective, but the opinion had been routinely announced prior to communication to the members of the panel of said withdrawal of respondents' oral commitment. Thus the statement in the opinion to the effect that such notice had not been received may be construed as technically inaccurate, but in any event the five-day period had not run at announcement time.

Respondents' letter announcing the withdrawal of their oral commitment related as the reason therefore that an "additional" death due to agranulocytosis associated with the use of Upjohn's Panalba, and the letter further recited that the Food and Drug Administration had concluded that the death was most likely caused by Panalba. In a responsive letter Upjohn disputes the cause of death and recites circumstances which it contends establish that the deceased patient's agranulocytosis was probably drug-induced and, if drug-induced, was probably attributable to dipyrone which had been administered, and which was not an Upjohn product.

At the time of the submission of our opinion for printing it appeared that its conclusion would render a resolution of the October 13, 1969, motion for a stay order pending review unnecessary, and no ruling thereon was therefor contained in the opinion. It now appears, however, that a ruling thereon is indicated. There is also before the Court a motion filed March 2, 1970, by Upjohn for a stay restraining the respondents from enforcing the September 19, 1969, order, either by refusing to certify additional batches of products or otherwise, pending the filing by Upjohn and disposition by the Supreme Court, of a petition for a writ of certiorari, and further requesting that the mandate of this Court in this case likewise be stayed.

On the record before it this Court has neither the capacity nor the inclination to assign the cause of death concerning which the parties' experts are in sharp disagreement, nor in effect by

granting an extended stay to determine that no unfortunate reactions may result from the prescription of the accused products. We are similarly unwilling to issue a stay for the full 21-day period prescribed by Rule 41(a) of the Federal Rules of Appellate Procedure, and accordingly,

It is ordered (1) that the motion for a stay order pending review filed by Upjohn on October 13, 1969, be and it hereby is denied; (2) that the motion of Upjohn filed March 2, 1970, for a stay pending the filing and disposition of a petition for a writ of certiorari be and it hereby is denied; (3) that the time for the issuance of the mandate of this Court shall be shortened to ten days (to March 9, 1970) (Rule 41(a), Federal Rules of Appellate Procedure); and (4) that respondents be and they hereby are restrained from enforcing the September 19, 1969, Order of the Commissioner of Food and Drugs pending the issuance of the mandate of this Court.