434 F.2d 536
 22 A.L.R.Fed. 865
 PFIZER, INC., Petitioner,
v.
Elliot L. RICHARDSON, Secretary of Health, Education and
Welfare, and Charles C. Edwards, Commissioner of
the Food and Drug Administration, Respondents.
 No. 217, Docket 35177.
 United States Court of Appeals, Second Circuit.
 Argued Sept. 30, 1970.
Decided Nov. 2, 1970.
 
 William W. Goodrich, Asst. Gen. Counsel, Food, Drugs and Environmental Health Division (Will Wilson, Asst. Atty. Gen., Criminal Division, John L. Murphy, Chief, Administrative Regulations Section, Howard S. Epstein, Atty., U.S. Dept. of Justice, Washington, D.C., Joanne S. Sisk and Eugene M. Pfeifer, Attys., U.S. Dept. of Health, Education and Welfare, Rockville, Md., of counsel), for respondents.
 William J. Manning, New York City (Simpson, Thacher & Bartlett, Albert X. Bader, Jr., Melvyn L. Cantor, Edward C. Mendrzycki, and Robert B. McKay, New York City, of counsel), for petitioner.
 Before DANAHER,[3] FRIENDLY and HAYS, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This is a petition by Pfizer, Inc., a prominent pharmaceutical manufacturer, pursuant to 701(f) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. 371(f), here applicable by virtue of the last sentence of 507(f), to review a final order of the Food and Drug Administration (FDA) issued July 14, 1970.[1] The order, made pursuant to 507(f) of the Act, see fn. 3 infra, repealed regulations, first issued during the 1950's, authorizing the distribution of six antibiotic drugs manufactured by Pfizer and revoked all certificates of safety and effectiveness thereunder. The FDA took this action without granting Pfizer an evidentiary hearing upon its objections. It sought to justify this summary procedure on the basis of a finding that Pfizer had failed to state 'reasonable grounds' for its objections within the meaning of 507(f). Judge Anderson granted a stay of the order pending argument of the petition on an expedited schedule; at argument we extended the stay until the filing of an opinion.
 
 
 2
 All six of the drugs are to be taken orally. Three are called Signemycin and three Sigmamycin. All are 'combination' drugs, containing two parts of tetracycline (or tetracycline hydrochloride), long and still approved antibiotics, and one part of triacetyloleandomycin (or oleandomycin phosphate), antibiotics also long and still approved. Since there is no contention that the case with respect to any of one of the preparations differs from the others, we shall follow the parties in referring to all six drugs as Signemycin.[2]
 
 I.
 
 3
 It will be useful to begin with some history. Section 505 of the Federal Food, Drug and Cosmetic Act of 1938, 52 Stat. 1052-53, prohibited the introduction into interstate commerce of any drug unless an application therefor had become effective. Safety was the primary criterion for passing on such applications, 505(d). Section 505(e) provided that once an application had become effective, it could be suspended, after due notice and opportunity for hearing to the applicant, if the Secretary, then of Agriculture, found that clinical experience, tests by new methods, or tests by methods not deemed reasonably applicable when the application became effective showed that the drug was unsafe for use, or that the application contained any untrue statement of a material fact.
 
 
 4
 Seven years later Congress amended the Act to deal with the first of the antibiotics, penicillin, by enacting an entirely new provision, 507, 59 Stat. 463-64. This empowered the Federal Security Administrator, to whom administration of the Food, Drug and Cosmetic Act had then been confided, to provide for the certification of batches of drugs composed of penicillin or its derivatives. He was to do this 'if such drug has such characteristics of identity and such batch has such characteristics of strength, quality, and purity, as the Secretary prescribes in such regulations as necessary to adequately insure safety and efficacy of use.' Section 507(b) directed him to issue regulations providing for such certification. Section 507(f) stated that any interested person could apply for the issuance, amendment, or repeal of any such regulation, and any interested person could file objections to such action. The section went on to say, substantially as it still does, that if reasonable grounds for such objections had been stated, the Administrator was to hold a hearing thereon. No drug subject to 507 was to be deemed subject to 505. The teeth of the statute were an addition to 502 of a new paragraph (l) making a penicillin drug not complying with 507 a misbranded article. Subsequent amendments added four other named antibiotics and their derivatives, including in 1949 chlortetracycline, 63 Stat. 409-10. The net of all this was that while the standard antibiotics were not subject to the elaborate 'new drug' procedures of 505 as such, they were under even more stringent regulation in two respects. Certification of batches of antibiotic drugs was required, and the drugs had to meet a standard of efficacy as well as of safety.
 
 
 5
 In 1962 Congress substantially amended the Food, Drug and Cosmetic Act. Section 505 was greatly stiffened. The Secretary, now of Health, Education and Welfare, was authorized by 505(d) to deny approval of a new drug not only if 'he has insufficient information to determine whether such drug is safe for use * * *' but also if 'there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof.' The subsection provided that:
 
 
 6
 As used in this subsection and subsection (e) of this section, the term 'substantial evidence' means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.
 
 
 7
 Section 505(e) authorized withdrawal of approval of an application not only for falsity or for considerations relating to safety, stated more broadly than in the 1938 Act, but also
 
 
 8
 on the basis of new information before him with respect to such drug, evaluated together with the evidence available to him when the application was
 
 
 9
 However, withdrawal could be effected evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof. However, withdrawal could be effected only 'after due notice and opportunity for hearing to the applicant' except when the drug was found to be an immediate danger to public health, in which event the Secretary might suspend approval immediately and give the applicant an expedited hearing.
 
 
 10
 Section 507 was also amended. Section 507(a) was broadened to include all antibiotic drugs, which were defined. An entirely new section, 507(h), established a special procedure governing antibiotics previously approved under 505, i.e., those antibiotics not specifically named in the pre-1962 version of 507, and brought within the latter section for the first time under the 1962 revision. The initial issuance of regulations providing for their certification or exemption under 507 was not to 'be conditioned upon an affirmative finding of the efficacy of such drug.' Any subsequent amendment or repeal of a regulation on the ground of a lack of efficacy could be effected
 
 
 11
 only if (1) such amendment or repeal is made in accordance with the procedure specified in subsection (f) of this section (except that such amendment or repeal may be initiated either by a proposal of the Secretary or by a petition of any interested person) and (2) the Secretary finds, on the basis of new information with respect to such drug evaluated together with the information before him when the application under section 505 became effective or was approved, that there is a lack of substantial evidence (as defined in section 505(d)) that the drug has the effect it purports or is represented to have under such conditions of use.
 
 
 12
 Section 507(f), which controls here, was left relatively unchanged; we quote it in full in the margin.[3]
 
 
 13
 The 1962 amendments presented the FDA with an enormous task of reviewing the efficacy of all new drugs that had been cleared, for safety only, between 1938 and October 10, 1962. On July 9, 1966, it announced, 31 F.R. 9426, an agreement to enlist the National Academy of Sciences-National Research Council (NAS-NRC) in this enterprise. The agreement also contemplated a survey of those antibiotic drugs like Signemycin, which had been certified or exempted from certification under 507 prior to October 10, 1962. To implement this agreement with respect to antibiotics and to facilitate the task of the Council in determining whether any certification or release should be rescinded or any regulation under 507 should be amended or repealed, the FDA, three months later, issued an order requiring each manufacturer to furnish specified information about the antibiotics in question. This included a 'list of literature references most pertinent to an evaluation of the effectiveness of the drug for the purposes for which it is offered in the label, package insert, or brochure' accompanying its sale and 'unpublished articles or other data pertinent to an evaluation of the claims.' Pfizer responded with respect to the Signemycin products.
 
 
 14
 In the winter of 1969, a panel of six physicians, chaired by Dr. William Kirby, reported on its study of the Signemycin drugs. The conclusion was that they were 'ineffective as a fixed combination.' We quote as an example a portion of its report on the most basic claim with respect to Signmycin Syrup:
 
 
 15
 INDICATIONS I. Signemycin is indicated in the therapy of acute severe infections caused by susceptible organisms and primarily by bacteria more sensitive to the combination than to either component alone. EVALUATION: Ineffective as a fixed combination. COMMENTS: Although either tetracycline or oleandomycin is effective in the treatment of some infections, there are serious objections to the use of the combination as formulated. Oleandomycin is present in insufficient amounts for effective treatment. If sufficient oleandomycin is administered for effective treatment, tetracycline overdosage results. The panel is not aware of infections caused by bacteria more sensitive to this combination than to either of its components. Establishing efficacy would involve demonstrating that the clinical response to the combination is greater than to either agent used alone. No such evidence is available. In vitro studies of this combination have given variable results. The effects may be antagonistic, additive, or synergistic, and are unpredictable for any particular organism. Thus, there is no evidence that each of the active ingredients contributes to the effect as claimed.
 
 
 16
 Four references were cited in support of this conclusion. Other adverse conclusions were stated to be based on the 'informed judgment of the Panel.' In response to this report, the FDA issued a notice on April 2, 1969, 34 F.R. 6008, expressing concurrence with the view that there was a 'lack of substantial evidence that each ingredient in the combination drugs listed above contributes to the total effects which the drugs are purported or represented to have under the conditions of use prescribed, recommended, or suggested in their labeling' and an intention to initiate proceedings to amend the antibiotic drug regulations to discontinue certification of the products containing these combinations. Interested parties who might be adversely affected were given 30 days to submit pertinent data with respect to this proposal.
 
 
 17
 Pfizer responded by letter on April 30. It cited studies of animals and in vitro which were alleged to demonstrate the greater effect of the combination than of either component and successful clinical experience, and appended numerous references to the literature. The letter also recognized the development of new laboratory and diagnostic procedures permitting more accurate evaluation than in the past. Accordingly Pfizer proposed three sets of new studies: One would be an in vitro study, taking three to for months, wherein 500 'clinical isolates' would be separately tested with tetracycline, oleandomycin, and a 2-1 combination. A second study, of similar duration, would cover four groups of 20 monkeys each, who had been inoculated to produce staphylococcal septicemia; one group would be orally treated with tetracycline, another with triacetyloleandomycin, a third with the 2-1 combination and the fourth with saline solution. Most important, Pfizer proposed a study of 600 patients having 'a Gram k infection' divided into three groups of 200, one to be treated with tetracycline, another with oleandomycin, and the third with the combination. The patient's 'cultures and sensitivities' would be examined and a wide variety of other tests would be made. It estimated that this study would take six to nine months.
 
 
 18
 The next step was the FDA's publication in the Federal Register on September 19, 1969, 34 F.R. 14596, of what it described as 'Procedural and Interpretative Regulations' governing, among other things the repeal of antibiotic drug regulations.[4] This announced that before initiating proceedings for such repeal based on adverse reports of the National Academy of Science-- National Research Council, Drug Efficacy Group, the agency would afford interested persons 'an opportunity to present any available evidence that would satisfy the requirements of law as defined by the term 'substantial evidence." In the absence of such evidence a formal proceeding would be initiated. Persons who would be adversely affected were entitled to request a hearing but 'before any evidentiary hearing will be ordered, it must appear affirmatively that there is a genuine and substantial issue of fact requiring such a hearing.' Unless the manufacturer 'can show a reasonable likelihood that he is prepared to produce 'substantial evidence' derived from adequate and well-controlled clinical investigations in support of his promotional claims, there is no basis for a hearing to receive evidence that would not in any event satisfy the legal requirement as to proof of effectiveness.' The Regulations spelled all this out, and included a detailed description of what would be regarded as 'adequate and well-controlled clinical investigations.'
 
 
 19
 Acting on the basis of these Regulations, the Commissioner on January 29, 1970, issued an order repealing the regulations covering the six drugs and revoking all certificates issued thereunder. 35 F.R. 1234-35. It reviewed the history and characterized Pfizer's response of April 30 as containing 'no new clinical data' and not providing 'substantial evidence of the effectiveness' of the drugs. The order allowed 30 days for the filing of objections, stating reasonable grounds and requesting a hearing thereon. The statement of reasonable grounds was required to 'identify the claimed errors in the NAS-NRC evaluation and the Administration's conclusions as to lack of 'substantial evidence' of the effectiveness of the combination drugs' and was to 'identify and provide a well-organized and full factual analysis of any adequate and well-controlled investigations the objector is prepared to prove in support of the objections as a basis on which it could reasonably be concluded that the combination drugs would have the effectiveness claimed for their intended uses.' The order was to become effective within 40 days unless stayed by the Commissioner.
 
 
 20
 However, the September 19 Regulations had meanwhile been declared invalid in Pharmaceutical Manufacturers Ass'n Finch, 307 F.Supp. 858 (D.Del.1970), for failure by the FDA to give the notice of proposed rule-making and opportunity for comment required by 4 of the Administrative Procedure Act (APA), 5 U.S.C. 553. Evidently considering discretion the better part of valor, the FDA on February 17, 1970, republished the September 19 Regulations as a proposal and requested comment thereon,[5] 35 F.R. 3073, meanwhile staying the effectiveness of the order that had been made with respect to Signemycin prior to the court decision.[6] On May 8 the FDA promulgated the Regulations without substantial change,[7] 35 F.R. 7250. In a preliminary statement it dealt with the comments of the pharmaceutical manufacturers; we shall later have occasion to mention some parts of this.
 
 
 21
 On June 5, 1970, Pfizer filed its objections and request for a hearing. It attacked the NAS-NRC report on various grounds. One was that the report ignored a 1959 Italian study by Arachi and Therardi showing that the oleandomycin tetracycline combination had cured 34 out of 37 patients with chronic nonspecific urethritis which had resisted other antibiotics, including, in eleven cases, tetracycline. The objections cited three new clinical studies, allegedly well-controlled. One, by Drs. Thomas and Durchell, concerned a number of healthy hospital personnel shown by culture of the nose and throat to be carriers of staphylococcus strains. Of 42 patients evaluated, 21 were 'cleared' of the strains by tetracycline. Thirteen of the failures were treated with triacetyloleandomycin, and eight were cleared. Two of the remaining five were treated with Signemycin and both were cleared. A second, by Drs. Cullen and Isenberg, also related to nasal carriers of staphylococci, in this instance prisoners, but divided the carriers into groups instead of treating them seriatim. The group treated with Signemycin showed better results than either group treated with a component alone. A third study, by Dr. Ente, compared the results of Signemycin and Ampicillin on two groups having serious throat infections; the two did about equally well.
 
 
 22
 The FDA, on July 14, 1970, entered the order repealing the Signemycin regulations here under review, 35 F.R. 11622. Faulting the various studies as failing to demonstrate that Signemycin was more efficacious than either of its components, for reasons discussed below, it held that Pfizer had failed to present 'reasonable grounds' for a hearing. The FDA noted that these deficiencies had been discussed at a meeting on June 19 and by a later letter.
 
 II.
 
 23
 Pfizer begins its attack on the denial of an evidentiary hearing with an argument drawn from the new drug section, 505(e). Under that section, the right to a hearing[8] on the proposed withdrawal of approval is alleged to be absolute, save only for the power of the Secretary to suspend for an imminent hazard to public health, in which event an expedited hearing is required. Why then, asks Pfizer, when the FDA proposes withdrawal of approval for an antibiotic long on the market, should the manufacturer have to make any preliminary showing? A sufficient answer is the simple if not altogether satisfying one that Congress said so. When it brought antibiotics under a separate section of the statute in 1945, it chose not to copy the 'after due notice and opportunity for hearing to the applicant' language of 505(e), 52 Stat. 1053 (1938), but to demand as a prerequisite to a hearing that those filing objections to the Secretary's action state 'reasonable grounds therefor.' 59 Stat. 464. That the Secretary's duty to hold a hearing is conditioned on such a statement emerges clearly from the statute. Only after an interested party has (1) filed his objections to the Secretary's action, (2) specified the changes desired, (3) stated reasonable grounds therefor, and (4) requested a hearing on such objections, does the Secretary's duty 'thereupon' to hold a public hearing arise. An objector failing to comply with any of these four requirements has simply failed to meet the statutory criteria on which the right to a hearing is predicated.[9]
 
 
 24
 Moreover, there was nothing irrational about this statutory scheme. Congress may well have thought the possibly lesser protection against withdrawal of approval of antibiotics was a fair trade for exemption from some of the long procedures incident to approval as a 'new drug.' Perhaps experience like that in 1941 and 1943 which is recorded in Atlas Powder Co. v. Ewing, 201 F.2d 347, 351 (3 Cir. 1952), cert. denied sub nom. Glyco Products Co. v. Federal Sec. Adm'r, 345 U.S. 923, 73 S.Ct. 781, 97 L.Ed. 1355 (1953), had caused disillusionment with trial-type hearings on scientific matters. Perhaps there was some other reason now lost in the mists of time, perhaps there was none.[10] In any event we must give effect to the restriction on the right to a trial-type hearing in 507(f), unless it denies due process. We see no reason to think it does. While a controversy over the efficacy of a particular drug raises an issue of 'adjudicative facts,' see 1 Davis, supra, 7.02 at 413, we perceive no denial of due process in Congress' directing an agency that it need not accord a trial-type hearing unless the affected party shows in advance that there is something substantial to hear. See NLRB v. Joclin Mfg. Co., 314 F.2d 627, 633 (2 Cir. 1963).[11]
 
 
 25
 The serious issue is whether the FDA acted lawfully in holding that Pfizer's submission did not constitute 'reasonable grounds.' Whatever meaning that phrase may have in other contexts, our inquiry here has been narrowed by the FDA's promulgation of regulations[12] effectively limiting 'reasonable grounds' to 'adequate and well-controlled investigations.'[13] The regulations provide:
 
 
 26
 No regulation providing for the certification of any batch of any drug composed wholly or in part of any kind of penicillin, streptomycin, chlortetracycline, chloramphenicol, bacitracin, or any other antibiotic drug, or any derivative thereof, intended for use by man shall be promulgated and no existing regulation will be continued in effect unless it is established by substantial evidence that the drug will have such characteristics of identity, strength, quality, and purity necessary to adequately insure safety and efficacy of use. 'Substantial evidence' has been defined by Congress to mean 'evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.' This definition is made applicable to a number of antibiotic drugs by section 507(h) of the Act, and it is the test of efficacy that will be applied in promulgating, amending, or repealing regulations for the certification of all antibiotics under section 507(a) of the Act as well.
 
 
 27
 35 F.R. 7252-53. If this provision is valid and Pfizer failed to meet it, the case is ended. Pfizer challenges its validity as applied to the 'old' antibiotics governed by 507(f).
 
 III.
 
 28
 We start from the proposition that if an administrative agency vested with rule-making powers, such as are possessed by the FDA under 507(a) and 701(a), has promulgated, in a rule-making proceeding pursuant to 4 of the APA, regulations whereby it will refuse to hear applications not conforming to criteria reasonably related to the regulatory statute, its application of such regulations so as to deny a hearing violates no legal rights. United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); FPC v. Texaco, Inc., 377 U.S. 33, 39, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964).[14] Pfizer contends that even if this be so, the FDA's insistence on 'adequate and well-controlled clinical investigations' as a condition to granting a hearing on the proposed withdrawal of approval of an 'old' antibiotic drug does not accord with the statutory scheme. It points to the fact that the definition of 'substantial evidence' as meaning 'evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have,' was expressly made applicable only to the approval of 'new drugs' under 505(d), the withdrawal of approval of such drugs under 505(e), and the withdrawal of approval of an antibiotic, not named in the pre-1962 version of 507, which had originally qualified as a new drug, 507(h). It places particular stress on the contrast between the express incorporation of the quoted definition in 507(h) and the absence of similar cross-reference in 507(f), and on the provision in 507(e) that, with an exception not here applicable, no drug subject to 507 'shall be deemed to be subject to any provision of 505.' It argues that in Upjohn Co. v. Finch, supra, 422 F.2d 944, the Sixth Circuit failed to take this into proper account.
 
 
 29
 While the contention has force, it does not squarely face the issue before this court-- whether the FDA may insist that the 'reasonable grounds' in 507(f) shall consist of 'adequate and well-controlled investigations,' not whether it must. We are not at all convinced that the FDA could not have issued regulations whereby nothing short of such investigations would constitute 'reasonable grounds,' even before the 1962 amendments. Pfizer has furnished us with no persuasive reason why the 1962 Congress should have wished to deny the FDA power to require 'adequate and well-controlled investigations' as a condition to continued approval of an 'old' antibiotic of questionable efficacy, if it chose to do so, although it granted such power with respect to the thousands of 'new drugs' approved since 1938 and the antibiotics approved as new drugs prior to 1962. The closest attempt at showing this is Pfizer's assertion that the 'old' antibiotics were of such generally recognized efficacy that Congress saw no need to subject them to 'adequate and well-controlled investigations' to establish this. But Congress has recognized from the start that even the named anitibiotics might turn out to be unsafe or inefficacious and had authorized the FDA to withdraw approval in that event. In effect Pfizer urges us to hold that because the 1962 Congress did not expressly require the FDA to insist on 'adequate and well-controlled investigations' in a proceeding to withdraw approval of an 'old' antibiotic, it therefore meant to prevent the agency from adopting a rule that would subject the 'old' antibiotics to this test. But there is nothing logically compelling about such an inference and we do not regard Congress' failure to incorporate in 507(f) something equivalent to the final clause of 507(h) as suggesting it. For we would hardly be justified in finding, on so scant a basis, a Congressional mandate requiring the FDA to employ a double standard of efficacy in evaluating antibiotics, all of which were now subject to 507.[15]
 
 
 30
 There is much less force in other arguments that Pfizer presents on this score. It says that if the FDA were to require 'adequate and well-controlled investigations' of all the 'old' antibiotics, there would not be enough investigators for that purpose. But there is nothing to suggest the FDA would do anything of the sort; for example, it has neither taken nor proposed to take any initiative against any of the components of Signemycin. An even worse situation than that envisioned by Pfizer would exist if the FDA were to move against all the 'new drugs' approved since 1938, yet Congress plainly authorized the agency to insist on 'adequate and well-controlled investigations' to establish the efficacy of any such drug that it had chosen to question. Pfizer says also that adequate and well-controlled investigations are but one of several scientifically valid methods of evaluating a drug's effectiveness, that general clinical experience has its place, and that disapproval resting solely on the lack of such investigations is not supported by substantial evidence. But, apart from the fact that Congress evidently thought otherwise, at least with respect to those drugs subject to 505(d) and 505(h), the point is sufficiently answered by the FDA's observation in promulgating the May 8 Regulations which we quote in the margin.[16] Moreover, the FDA did not here rely solely on the lack of adequate and well-controlled investigations but on the references to the literature cited by the NAS-NRC panel and other such references discussed in the FDA's final order.
 
 
 31
 Pfizer points also to the extreme hardship that would result if the FDA were suddenly to confront a manufacturer of an 'old' antibiotic, who had no reason to suppose the efficacy of his product was in question, with the need of producing an adequate and well-controlled investigation within 30 days. This is partially answered by the statement of FDA policy made in promulgating the May 8 Regulations which we quote below.[17] In any event the point is inapplicable to this case. Pfizer knew since the spring of 1969, if not before, that the efficacy of Signemycin was being seriously questioned for lack of evidence that it lived up to its labeling as more effective than either of its components. On April 30 of that year Pfizer proposed a program of what would appear to be 'adequate and well-controlled' in vitro, animal and clinical studies that would have fully met FDA requirements. Its present problem arises from its apparently unexplained failure to do anything to pursue them. If it had initiated such studies and needed a bit more time than general agency policy, see fn. 17, allowed and the FDA had then cracked down, we would have a different case.
 
 
 32
 Little need be said with respect to Pfizer's argument that even if adequate and well-controlled investigations could lawfully be required as a condition to an evidentiary hearing, it met the test. While such a determination is peculiarly within the FDA's expertise and we would be reluctant to intrude into medical maters we do not truly understand, it is apparent even to us laymen that the FDA had a reasonable basis for considering that Pfizer's submissions did not comply with the requirement of the statute and the Regulation. We quote in the margin the passages of its final order relevant to the Italian, Thomas-Burchell and Cullen-Isenberg studies.18-20 The Ente study was sufficiently disposed of by the obvious point that all it could possibly demonstrate was that Signemycin was as effective as Ampicillin; this had nothing to do with the issue whether Signemycin had effects not attainable as well or better by either of its components alone. The contrast between what Pfizer produced and what it had undertaken to produce in the way of adequate and well-controlled investigations was also significant in this context.[21]
 
 
 33
 Pfizer's final contention is that since 507(a) speaks only of 'efficacy of use,' the FDA is not authorized to withdraw approval of an 'old' antibiotic drug, not shown to be without efficacy simply because it lacks efficacy 'as a fixed combination.' Here again such problem as there is arises from the fact that the 1962 Congress did not choose to incorporate in the portions of 507 dealing with 'old' antibiotics the more elaborate language used in the amendment of the 'new drug' section, 505(e), and the provision, 507(h), dealing with antibiotics originally approved as 'new drugs.' Section 505(e) permits withdrawal of approval of a 'new drug' if on the basis of new information with respect to the drug,[22] there is lack of substantial evidence 'that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof,' and 507(h) is to the same effect with respect to an antibiotic originally certified as a new drug. A good case could certainly be made that, quite apart from this, the 'efficacy' of a drug is necessarily related to the use recommended. Be that as it may, it was within the FDA's rule-making power to flesh out the word 'efficacy' in 507(a) so as to apply these more precise requirements, which Congress imposed on new drugs and on antibiotics originally certified as new drugs, to the old antibiotics as well. While the FDA was thus justified in requiring proof 'that the response to the combination is greater than to either component alone,' 35 F.R. 11625, it found also, that 'the unnecessary use of an antibiotic, in a fixed combination dosage form, when one or the other component would suffice, favors the emergence in the environment of resistant microorganisms,' 35 F.R. 11624, and, 'that both components of the fixed combination drug have adverse effects which must be taken into account,' 35 F.R. 11625. Such findings support a conclusion of lack of 'safety and efficacy of use' even without the gloss placed on that phrase of 507(a) by the May 8 Regulations.
 
 
 34
 We therefore deny Pfizer's petition to review. Since the company may desire to pursue the matter further and there is no evidence that Signemycin constitutes a serious safety threat, we will continue the stay of the FDA's order until 30 days from the filing of this opinion and, if within that period an application for a stay of longer duration is made to the Supreme Court, until determination thereof.
 
 
 
 *
 Senior Circuit Judge of the District of Columbia, sitting by designation
 
 
 [1]
 This order was published in the Federal Register on July 21, 1970, 35 F.R. 11622, and was to become effective on July 31, 1970
 
 
 [2]
 Although the FDA's final order embraces all six Signemycin products referred to in the text, 35 F.R. 11622, only two ('Signemycin 125 Syrup' and 'Signemycin 375 Capsules') may be immediately affected by this proceeding if, as Pfizer contends, all of its other Signemycin products have been withdrawn from the American market. In filing its formal objections to the FDA's order repealing the certification of Signemycin, Pfizer did not contest the order with respect to the four other antibiotics listed therein
 
 
 [3]
 507(f) Any interested person may file with the Secretary a petition proposing the issuance, amendment, or repeal of any regulation contemplated by this section. The petition shall set forth the proposal in general terms and shall state reasonable grounds therefor. The Secretary shall give public notice of the proposal and an opportunity for all interested persons to present their views thereon, orally or in writing, and as soon as practicable thereafter shall make public his action upon such proposal. At any time prior to the thirtieth day after such action is made public any interested person may file objections to such action, specifying with particularity the changes desired, stating reasonable grounds therefor and requesting a public hearing upon such objections. The Secretary shall thereupon, after due notice, hold such public hearing. As soon as practicable after completion of the hearing, the Secretary shall by order make public his actions on such objections. The Secretary shall base his order only on substantial evidence of record at the hearing and shall set forth as part of the order detailed findings of fact on which the order is based. The order shall be subject to the provisions of section 701(f) and (g)
 
 
 [4]
 The Regulations were doubtless inspired by Upjohn Co. v. Finch, 303 F.Supp. 241 (W.D.Mich.1969), and American Home Products v. Finch, 303 F.Supp. 448 (D.Del.1969), where district courts had enjoined the FDA from removing products from the market until thirty days after ruling on objections seeking a hearing
 
 
 [5]
 During the period afforded for comment the Sixth Circuit sustained action by the FDA repealing the regulations for certain combination antibiotics manufactured by the Upjohn Co. without an evidentiary hearing, thus in effect upholding the substance of the September 19 Regulations as applied to 'old' antibiotics, Upjohn Co. v. Finch, 422 F.2d 944 (6 Cir. 1970)
 
 
 [6]
 Although the order concerning Signemycin was published in the Federal Register on January 30, 1970, two weeks after the decision in Pharmaceutical Manufacturers Ass'n v. Finch, supra, the apparent inconsistency with the statement in the text is explained by the fact that the FDA's order was dated several days prior to the decision
 
 
 [7]
 The substantive validity of the May 8 Regulations has recently been sustained in a suit instituted by the Pharmaceutical Manufacturers Association. Pharmaceutical Manufacturers Ass'n v. Richardson, 318 F.Supp. 301 (D.Del.1970). However, the principal claim in that case was that the requirement that only adequate and well-controlled investigations would constitute 'substantial evidence' was invalid with respect to any antibiotic drugs approved between 1938 and 1962, and the court did not have to focus on the particular status of 'old' antibiotics that is here alleged
 
 
 [8]
 Although the word 'hearing' can mean either an argument-type or a trial-type hearing, see 1 Davis, Administrative Law Treatise 7.01 at 408 (1958), the context, particularly the last sentence of 505(e) and 701(f)(2), indicates that the latter was here intended
 
 
 [9]
 The House Report provides additional support for this interpretation, if any be needed. Its comment on 507(f) states that the subsection 'is designed to insure the right of protest to all interested persons who have reasonable grounds for dissatisfaction with the Administrator's action,' H.R.Rep. 702, 79th Cong., 1st Sess., p. 4 (1945), and that 'reasonable grounds for it (the objector's proposal) must be stated,' id
 
 
 [10]
 Neither the House Report, supra note 9, nor the Senate Report, 79th Cong. 1st Sess., No. 410 (1945), sheds any light on the differences in wording. The measure appears to have been a cooperative one, sponsored by the Federal Security Agency and supported by the manufacturers of penicillin
 
 
 [11]
 Our opinion is not to be taken as casting doubt upon the conclusion in Pharmaceutical Manufacturers Ass'n v. Richardson, supra, note 7, that the FDA may by regulation validly condition the granting of a trial-type hearing under 505(e) upon a showing of reasonable grounds. We simply do not have to reach that question here
 
 
 [12]
 These are the May 8, 1970 Regulations, first published in September 1969 and republished as a proposal in February 1970 before they finally became effective. See text at note 4 supra
 
 
 [13]
 Had the FDA failed to provide this explicit content for the term 'reasonable grounds,' we would have been faced with the task of determining whether the agency, in denying Pfizer's request for an evidentiary hearing, had reasonable grounds for finding a lack of 'reasonable grounds' in the proffered objections, a term whose meaning is not elucidated by the statute or judicial decision. Seizing on the FDA's statement that the May 8 Regulations 'are an adaptation of the summary judgment procedures of the U.S. District Courts,' Pfizer relies on well-known authorities proclaiming the severity of the burden of a party relying on F.R.Civ.P. 56. We do not find these truly apposite. Congress was dealing in 507(f) with an area entirely different from ordinary civil litigation. As indicated above, it could well have thought that trial-type hearings were not particularly useful in enabling the FDA to reach a right decision on a matter of medical opinion where the authorities are likely to include a considerable time span and a wide geographical scope, as was the case here, and cross-examination would rarely cause an author to admit the invalidity of what he had written in a scientific journal
 
 
 [14]
 We are aware that in both these decisions the Court placed some weight on the provisions of the regulations whereby the agency could 'waive' the criteria on a sufficient showing, 351 U.S. at 205, 76 S.Ct. 763; 377 U.S. at 40-41, 84 S.Ct. 1105. Since such provisions say little more than that the agency will dispense with its criteria if it thinks that to be in the public interest, as it always can, we cannot believe anything turns on this being stated explicitly rather than being left implicit. The FDA does not initiate withdrawal proceedings unless the NAS-NRC inquiry, its own evaluation and the literature indicate grounds for concern. Read sensibly the Regulations simply warn that, once a withdrawal proceeding has begun, the FDA may choose not to be convinced in any way other than by 'adequate and well-controlled investigations.'
 
 
 [15]
 This answers what might otherwise be a ligitimate complaint by Pfizer that our position here is inconsistent with our reading the 'reasonable grounds' provision of 507(f) to mean what it says, despite the lack of any apparent reason why Congress should have imposed stiffer conditions for obtaining a hearing under 507(f) than under 505(e)-- if, in fact, it did, see note 11 supra
 
 
 [16]
 Clinical experience with these drugs can and should be considered in evaluating claims of effectiveness, but experience derived from isolated case reports, from random observations, or from clinical reports without details which permit scientific evaluation, or reports of clinical experience derived under circumstances that fall below the standards of appropriate clinical trials are of little or no value. Well-documented clinical experience in an uncontrolled or partially controlled situation may be of value in contributing information as to the drug's safety, side effects, contraindications, warnings and precautionary needs. It can as well be considered as corroborative evidence along with data derived from adequate and well-controlled clinical investigations to support claims of effectiveness. But it cannot alone rise to the level of adequate and well-controlled clinical investigations, even when done by an experienced investigator or reported by any number of investigators who have conducted inadequately controlled clinical trials
 
 
 [17]
 Agency policy provides a period of time after publication of any NAS-NRC evaluation of a drug as 'possibly effective' or 'probably effective,' 6 months in the first case and 12 months in the latter, for the development of appropriate proof of effectiveness through clinical investigations which meet the requirements of adequate and well-controlled investigations. When a drug has been evaluated as 'ineffective,' 'ineffective as a fixed combination,' or 'effective but,' the time frame for action is shorter, 30 days for voluntary corrective action. When it can be shown that administration of the drug involves no hazard to the patient, and that an appropriate clinical investigation can and will be planned and completed within a reasonably short time agreed upon by the Agency and the drug sponsor, the Agency will extend the 30 day period if there is a medical justification for doing so. While the investigation is under way, there will be a requirement that the promotional material for the drug disclose the NAS-NRC findings with respect to effectiveness. But a 2 year blanket extension for the development of evidence to support claims of effectiveness is unacceptable
 
 
 [18]
 With respect to the Italian study:
 This was a clinical study of 37 cases of chronic aseptic urethritis which had resisted previous therapies. There were no controls. The patients had had the disease for various lengths of time, ranging from 2 months to 12 years, making it likely that these were recurrent or new rather than chronic infections. All the patients were treated for 10 days with the Signemycin combination and 34 showed a clinical cure, according to the authors. It is not stated or demonstrated that they were bacteriologically cured. The history of the response of these patients prior to Signemycin treatment cannot be said to constitute a 'valid historical control,' as Pfizer contends, since no data is supplied about such treatment except the name(s) of the drug(s). Prior treatment could have been inappropriate or inadequate.
 
 
 [19]
 With respect to the Thomas-Burchell study:
 A study of drug effect in volunteers who are well, but are staphylococcus nasal carriers, is not a valid clinical trial applicable to the therapeutic claims made for Signemycin. Moreover, such carriers are notoriously recalcitrant to treatment. A single, negative, nasal culture immediately after antibiotic treatment is not sufficient and followup cultures might well show persistence of the carrier state. No conclusion can be drawn from this study, since the three groups were not tested simultaneously.
 
 
 [20]
 With respect to the Cullen-Isenberg study: This preliminary study, although an interesting model, does not involve a valid therapeutic situation, and has little or no relationship to the effectiveness of the drugs in the treatment of acute severe infections caused primarily by bacteria more sensitive to the combination than to either component alone, which are the conditions of use for which Signemycin is represented in its labeling
 
 
 [21]
 Pfizer relies heavily on affidavits from three physicians submitted to Judge Anderson on its motion for a stay. While in the absence of application and action under 701(f)(2), we do not consider these to be properly before us save on Pfizer's motion for a further stay in the event of adverse decision, the affidavits when read as a whole say little more than that in the affiants' opinion the evidence submitted by Pfizer warranted further investigation prior to withdrawal of approval. The FDA was free to take a different view if, as we hold, Pfizer had failed to meet valid tests for a hearing with respect to continued certification. Our view that the material is not properly before us on the petition to review applies also to an affidavit of Pfizer's Vice President and Medical Director that the FDA misinterpreted an Indian study cited for the first time in the FDA's final order. Nevertheless we do agree that, in determining whether an objector has presented reasonable grounds for a hearing on the repeal of a regulation, the FDA should not rely on references which were not previously cited and the objector had no chance to meet. When new literature supporting an adverse recommendation by a NAS-NRC panel has appeared and the FDA wishes to rely upon this, it should bring it to the attention of the manufacturer and give him an opportunity for comment. We are convinced, however, that the FDA would, and permissibly could, have reached the same conclusion here even if Pfizer's interpretation of the conclusions of the Indian study is the right one, and there is thus no need to remand. Cf. Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 66-67, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961), and the discussion by the writer in Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L.J. 199, 219-22
 
 
 [22]
 Pfizer advances but does not seriously press the argument that the FDA did not have adverse information not available when Signemycin was initially certificated. Assuming as we do that if the FDA wishes to incorporate the standards of 505(e) and 507(h) in its administration of 507(f), it should take all of them including this one, as the FDA's brief appears to concede, we consider the argument sufficiently answered by Bell v. Goddard, 366 F.2d 177, 181 (7 Cir. 1966)